# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Rita Joyce Glenn, individually and as personal representative of the Estate of Thomas Harold Glenn, deceased, Respondent,

v.

3M Company, f/k/a Minnesota Mining and Manufacturing Co.; Air & Liquid Systems Corporation, Individually and as Successor-In-Interest to Buffalo Pumps; Airgas USA, LLC; Aurora Pump; BW/IP Inc., a Subsidiary of Flowserve Corporation; CBS Corporation, a Delaware Corporation f/k/a Viacom, Inc., Successor By Merger to CBS Corporation, a Pennsylvania Corporation, f/k/a Westinghouse Electric Corporation; CGR Products, Inc., f/k/a Carolina Gasket and Rubber Company, Inc.; Carboline Company; Crane Co. d/b/a Crane Chempharma & Energy d/b/a Aloyco, n/k/a Crane Energy Flow Solutions; Crosby Valve, Inc.; Dana Companies, LLC; Daniel International Corporation; Fisher Controls International, LLC.; Flowserve Corporation, Individually and as Successor in Interest to Anchor/Darling Valve Company; Flowserve Corporation, Individually and as Successor to Byron Jackson Pump Company; Fluor Daniel, Inc., f/k/a Daniel Construction Company, Inc.; Fluor Daniel Services Corporation; Foster Wheeler Energy Corporation; General Electric Company; Goodyear Tire & Rubber; Goulds Pumps, Inc.; Grinnell LLC, f/k/a Grinnell Corp, f/k/a ITT Grinnell Corp., Individually and as Successor to Kennedy Valve Manufacturing Co., Inc.; Hajoca Corporation; Imo Industries, Inc., Individually and as Successor-in-Interest to De Laval Turbine, Inc.; Ingersoll Rand Company; ITT Corporation; John Crane, LLC; Linde LLC, a Delaware Limited Liability Company, formerly known as the BOC Group, Inc. and/or Airco, Inc.; MP Supply, Inc. f/k/a Mill Power Supply; Metropolitan Life Insurance Company, a

wholly-owned subsidiary of MetLife Inc.; Sepco Corporation; The J.R. Clarkson Company Solely as a Successor by Merger to Anderson Greenwood & Co., f/k/a Kunkle Valve Company, Inc.; The Sherwin-Williams Company; Trane U.S. Inc., f/k/a American Standard, Inc.; United Conveyor Corporation; United Seal & Rubber Company, Inc.; Uniroyal, Inc., f/k/a United States Rubber Company, Inc.; Velan Valve Corporation; Viking Pump, Inc.; and Weir Valves & Controls USA, Inc., Individually and as Successor in Interest to Atwood & Morrill Co., Inc., Defendants.

Of which Fisher Controls International LLC is the Appellant.

Appellate Case No. 2019-001600

———————

Appeal From Anderson County
Jean Hoefer Toal, Acting Circuit Court Judge

———————

Opinion No. 5975
Heard October 3, 2022 – Filed April 5, 2023

———————

**AFFIRMED IN PART AND REMANDED**

———————

C. Mitchell Brown, Allen Mattison Bogan, and Nicholas Andrew Charles, all of Nelson Mullins Riley & Scarborough, LLP, of Columbia, for Appellant.

Theile Branham McVey, of Kassel McVey, of Columbia, and Lisa White Shirley, Jessica M. Dean, and Jonathan Marshall Holder, all of Dallas, TX, for Respondent.

———————

**GEATHERS, J.:** In this complex asbestos case, Appellant Fisher Controls International LLC (Fisher) seeks review of the circuit court's (1) denial of Fisher's motion for a judgment notwithstanding the verdict (JNOV), (2) denial of Fisher's

new trial motion, (3) partial denial of Fisher's motion for setoff, and (4) imposition of discovery sanctions. Among a legion of arguments made in its brief, Fisher maintains that the circuit court should have granted a setoff in the full amount of the settlement proceeds obtained by Respondent Rita Joyce Glenn (Rita) prior to trial against the jury's compensatory damages award. We affirm in part and remand for reconsideration of the respective amounts to be set off against the jury's compensatory damages awards for Rita's claims for wrongful death, survival, and loss of consortium.

## FACTS/PROCEDURAL HISTORY

From the mid-1970s to at least 1990, Rita's husband, Thomas Harold Glenn (Tommy), worked as an instrument technician at the Oconee Nuclear Station operated by Duke Power Company (Duke) in Seneca. His work regularly required him to be within close proximity to co-workers' removal of gaskets and packing from valves manufactured by various companies,[1] including control valves sold by Fisher to Duke. The gaskets and packing often included asbestos, which could stand up to extremely high temperatures and high pressure. There were numerous Fisher valves at the plant, and some of them ranged from one inch to sixteen inches in diameter at the pipe connection, while others were approximately six feet tall. When the gaskets and packing in these valves were disturbed, Tommy was exposed to large quantities of asbestos.

Fisher anticipated that the gaskets and packing in their valves would deteriorate after normal use, so it sold replacements to Duke. As these gaskets deteriorated, they became brittle. Therefore, replacing one of these gaskets involved removing it from the valve component with which it was paired using a wire brush or power grinder so that the component's surface was clean enough to prevent future leaks. This process created visible dust. The removal of worn packing from valves also created dust.

Whenever a reactor unit at the plant would shut down for refueling, Tommy was routinely working alongside a crew performing maintenance work on Fisher valves and its components, which included scraping off the internal bonnet gaskets.

---

[1] A gasket is "a material (such as rubber) or a part (such as an O-ring) used to make a joint fluid-tight." *Gasket*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/gasket (last visited April 3, 2023). According to an employee of one of Fisher's co-defendants, packing is a "product that fits in a pump or a valve to prevent leakage from one area to another."

One of Tommy's co-workers explained that every 18 months, a reactor unit would shut down to refuel, i.e., "put new uranium in the core," which gave employees "the opportunity to do massive repairs" and maintenance. It was important to get as much work done as possible during these outages; therefore, the instrumentation crew had to work 12 hours a day, seven days a week, "because Duke was losing money if it wasn't generating."

Because the Oconee plant had three units, it had a minimum of two outages per year, and an outage would last at least sixty days. During outages, it was common for many different crews, including various instrumentation crews, to simultaneously occupy the same area while performing their respective tasks. This included Tommy's close proximity to another crew's removal of gaskets and packing from control valves, and, at times, they would even be working "on the same scaffold together."

In addition to the gaskets located inside the control valves, gaskets were used on the control valves' external flanges connecting the valves to piping in the plant,[2] and these gaskets were periodically replaced when Tommy was nearby. Although Fisher sold replacements for only those gaskets that were used inside its valves, its control valve handbook stated that gaskets made of asbestos were an option for the user to apply to its valves' external flanges.

Ultimately, Tommy was diagnosed with asbestos-related mesothelioma.[3] He underwent extensive medical treatments and took large amounts of pain medication. After an unsuccessful surgery for his condition, Tommy died on February 17, 2015. Subsequently, Rita filed the present products liability action against Fisher and numerous co-defendants, alleging that Tommy was exposed to asbestos emanating from the defendants' products. Rita asserted claims for wrongful death, survival, and loss of consortium based on theories of relief that included negligence, breach of implied warranty, and strict liability.

Prior to trial, the circuit court denied Fisher's motion in limine to exclude the testimony of Rita's medical experts but granted Rita's motion in limine to exclude a tissue study performed by Fisher's pathologist. Also prior to trial, the circuit court

---

[2] A flange is "a rib or rim for strength, for guiding, or for attachment to another object." *Flange*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/flange (last visited April 3, 2023).

[3] According to one of Rita's medical causation experts, Dr. Arthur Frank, mesothelioma is "an aggressive cancer of the membranes lining the lungs."

approved a settlement between Rita and some of Fisher's co-defendants. The circuit court also approved Rita's designated allocation of 90 percent of the settlement proceeds to her wrongful death claim and 10 percent to the survival claim.

In January 2019, the circuit court conducted a trial on Rita's claims against Fisher and two co-defendants. Fisher's position at trial was that the asbestos gaskets in its valves were not harmful because they were encapsulated. At the conclusion of trial, the jury returned a verdict against Fisher on the negligence and breach of warranty theories of relief and awarded Rita $1 million for Tommy's survival damages, $1 million for wrongful death damages, and $1 million for Rita's loss of consortium damages. Additionally, the jury found "by clear and convincing evidence that the conduct of [Fisher was] willful, wanton or reckless" and awarded Rita $2,125,000 for punitive damages.

Fisher submitted several post-trial motions, including a motion for a setoff of Rita's pre-trial settlement proceeds against the jury's respective compensatory damages awards on Rita's three claims. The circuit court granted this motion in part, allocating 90 percent of the proceeds to the wrongful death claim and 10 percent to the survival claim and denying a setoff against the loss of consortium claim. The circuit court denied Fisher's remaining post-trial motions and granted Rita's post-trial motion for discovery sanctions. This appeal followed.

## LAW/ANALYSIS

### I.     Inconsistent Verdicts

Fisher argues it is entitled to a new trial because the jury's verdicts on the strict liability and negligence theories of relief were inconsistent and the circuit court failed to instruct the jury to correct the inconsistency. Fisher asserts that the jury's finding for Fisher as to strict liability and its finding for Rita as to negligence were inconsistent because the elements of strict liability are subsumed within the elements of negligence. We conclude that the circuit court acted within its discretion in denying the new trial motion. *See Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 49, 691 S.E.2d 135, 149 (2010) ("Whether to grant a new trial is a matter within the discretion of the trial judge, and this decision will not be disturbed on appeal unless it is unsupported by the evidence or is controlled by an error of law.").

While giving instructions to the jury, the circuit court stated:

Plaintiff's claims in this case are based on three theories. The first theory is negligence, the second one is called strict liability, and the third is called breach of implied warranty. *The plaintiffs are not required to prove all of these theories to recover. Proof of a claim under any one of these theories would enable you to find that the plaintiffs are entitled to a verdict.* But the plaintiff must meet their burden of proof as to at least one of these theories in order to recover.

(emphasis added). The circuit court also instructed the jury to place the focus on the product rather than the defendant's conduct when evaluating a strict liability claim but to focus on the defendant's conduct when evaluating a negligence claim.

During their deliberations, the jury sent a question to the circuit court:

Under Charge 13, strict liability, the plaintiffs must prove three things: First, that the product was in a defective condition, unreasonably dangerous to the plaintiff; two, that at the time of the injury the product was in essentially the same condition as it was when it left defendants' hands; three, plaintiff was injured by the product.

As to Question 4 on the verdict form, which is one of three questions that asks the same thing for three different defendants, and the Question 4 is: We, the jury, find the Defendant Fisher Controls is strictly liable for selling products that proximately caused injury to the plaintiff, yes or no. And that same question is asked for all three defendants. As to strict liability question.

As to Question 4 on the verdict form, determining strict liability, must all three things mentioned above be found true, or do Charges 14 for reasonable alternative design, 15 for design defect, or Charge Number 16 negate the fact that all three things under 13 must be true? In other words, is 13 an overarching umbrella for answering strict liability and 14, 15 and 16 follow underneath?

The circuit court provided the following response:

In all circumstances, all three elements of Charge 13 must be proven in order to find strict liability. A defective condition, which is the heart of the strict liability issue, may be established in two ways: One, a design defect, and Instructions 14 and 15 discuss a design defect; or, two, a warning defect, which is addressed by 16. That is my instruction, ladies and gentlemen.

A portion of the verdict form asked jurors to select blanks corresponding to "Yes" or "No" for a series of statements. For instance, the jury indicated "Yes" to a statement concluding that Fisher "was negligent, and its negligence was a proximate cause of the Plaintiff's injuries." As to strict liability, in response to the statement "We the jury find [Fisher] is strictly liable for selling products that proximately caused injury to Plaintiff," both blanks were marked in some fashion. It appears that initially, the foreman marked the blank in front of "Yes" but scratched out the mark and then marked the blank in front of "No." What appears to be a "CK" notation is written beside "No." Notably, the jury marked the "Yes" option to Finding 7, which states that Fisher "breached the Implied Warranty in selling its products and its breach was a proximate cause of Plaintiff's injury and damages." The jurors also found "by clear and convincing evidence" that Fisher's conduct was "willful, wanton, or reckless,"[4] and they completed a "Punitive Damage Verdict Form" indicating they assessed punitive damages against Fisher in the amount of $2,125,000.

In its order addressing Fisher's post-trial motions, the circuit court stated, "Fisher has not shown that the jury's finding on strict liability was due to the absence of an element shared by the companion negligence claim in this case." The circuit court also stated, "The jury's questions about the strict liability instructions indicated division regarding whether to find for Plaintiff or Fisher on this claim. Their unanimous verdict on all three claims, finding in favor of Plaintiff on two and in favor of Fisher on one, was the jury's prerogative."

"A jury verdict should be upheld when it is possible to do so and carry into effect the jury's clear intention. However, when a verdict is *so confused that the jury's intent is unclear*, the safest and best course is to order a new trial." *Vinson v. Jackson*, 327 S.C. 290, 293, 491 S.E.2d 249, 250 (1997) (emphasis added) (quoting

---

[4] *See Taylor v. Medenica*, 324 S.C. 200, 221, 479 S.E.2d 35, 46 (1996) ("In order for a plaintiff to recover punitive damages, there must be evidence the defendant's conduct was willful, wanton, or in reckless disregard of the plaintiff's rights.").

*Johnson v. Parker*, 279 S.C. 132, 303 S.E.2d 95 (1983)). "Verdicts [that] are irreconcilably inconsistent should not stand, and a new trial should be granted, because the parties and the judge 'should not be required to guess as to what a jury sought to render.'" *Austin*, 387 S.C. at 49, 691 S.E.2d at 149 (quoting *Prego v. Hobart*, 287 S.C. 116, 118, 336 S.E.2d 725, 726 (Ct. App. 1985)). On the other hand, "[i]t is the duty of the court to sustain verdicts when a logical reason for reconciling them can be found." *Id.* at 49–50, 691 S.E.2d at 149 (quoting *Rhodes v. Winn–Dixie Greenville, Inc.*, 249 S.C. 526, 530, 155 S.E.2d 308, 310 (1967)).

Here, the general verdict form, in its entirety, clearly shows the jury's intent to hold Fisher liable for the unreasonably dangerous products it sold to Duke (the asbestos gaskets and packing) regardless of the theories on which Rita sought recovery, especially when viewed in light of the circuit court's instructions to the jury regarding products liability in general and the elements for each theory of recovery, which we discuss in more detail below.

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if (a) The seller is engaged in the business of selling such a product, and (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

S.C. Code Ann. § 15-73-10 (2005). "A products liability case may be brought under several theories, including strict liability, warranty, and negligence." *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 462, 494 S.E.2d 835, 842 (Ct. App. 1997).

> [R]egardless of the theory on which the plaintiff seeks recovery, he must establish three elements: (1) he was injured by the product; (2) the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant.

*Id.* at 462–63, 494 S.E.2d at 842. "[U]nder a negligence theory, the plaintiff bears the additional burden of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect, and, unlike strict liability, the focus is on the

conduct of the seller or manufacturer, and liability is determined according to fault." *Bragg v. Hi-Ranger, Inc.*, 319 S.C. 531, 539, 462 S.E.2d 321, 326 (Ct. App. 1995). Further, "liability may be imposed upon a manufacturer or seller notwithstanding subsequent alteration of the product when the alteration could have been anticipated by the manufacturer or seller . . . ." *Small*, 329 S.C. at 466, 494 S.E.2d at 844.

Fisher cites *Branham v. Ford Motor Co.*, 390 S.C. 203, 210, 701 S.E.2d 5, 8 (2010), in support of its argument that the strict liability verdict "is a finding that Fisher's product was *not* in a defective condition unreasonably dangerous to the user." (Fisher's emphasis). However, it is speculative to attribute the strict liability verdict to a specific finding regarding the product's condition because the strict liability theory of recovery has two other elements that the jury could have determined were not present. *See supra*. Nonetheless, it appears the jury found one of the three elements of strict liability was missing, and all three of these elements are also required for a negligence claim. *See supra*. Although the facts in *Branham* are distinguishable from the facts in the present case, our supreme court's analysis in that case is instructive.

In *Branham*, the circuit court concluded that as a matter of law, the product at issue was not in a defective condition and, therefore, declined to send the plaintiff's strict liability claim to the jury. *Id.* at 210, 701 S.E.2d at 8. Our supreme court held that the circuit court should have also dismissed the plaintiff's negligence claim because that claim also included the product's defective condition as an element. *Id.* at 212, 701 S.E.2d at 9. The court stated, "When an element common to multiple claims is *not established*, all related claims must fail." *Id.* at 210, 701 S.E.2d at 8 (emphasis added).

Rita cites *Bragg v. Hi-Ranger, Inc.* for the following proposition: "Strict liability and negligence are not mutually exclusive theories of recovery; that is, an injury may give rise to claims that can be established either under principles of strict liability or negligence, and failure to prove one theory does not preclude proving the other." 319 S.C. 531, 539, 462 S.E.2d 321, 326 (Ct. App. 1995). In *Bragg*, this court affirmed the circuit court's refusal to direct a verdict on the plaintiff's negligence claims despite affirming the circuit court's directed verdict as to the plaintiff's strict liability claim. *Id.* at 537–47, 462 S.E.2d at 325–30. This court illustrated its reasoning with cases from other jurisdictions, including *Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn. 1984) and *Bigham v. J.C. Penney Co.*, 268 N.W.2d 892 (Minn. 1978). In *Bilotta*, the Supreme Court of Minnesota explained, "Whether strict liability or negligence affords a plaintiff the broader theory of recovery will depend largely on the scope of evidence admitted by the trial court and

on the jury instructions given under each theory . . . ."  *Bragg*, 319 S.C. at 540, 462 S.E.2d at 326 (quoting 346 N.W.2d at 622).  In *Bigham*,

> the Supreme Court of Minnesota held the jury's findings that the [plaintiff's] work clothes were not "in a defective condition unreasonably dangerous to the plaintiff" and that [the defendant] breached neither an expressed nor implied warranty, but was nevertheless causally negligent, were not irreconcilable where there were no warning tags with respect to the flammability of the work clothes.  *The strict liability instructions required the jury to assess a defect dangerous to the ordinary consumer, whereas the [plaintiff] lineman's work subjected him to fire hazards.  Therefore, while the failure to warn of the flammable characteristics of the clothing was negligent as to the plaintiff, those characteristics did not necessarily render the clothing "defective and unreasonably dangerous" toward an ordinary consumer not exposed to unusual fire hazards.*  Thus, the Court concluded that "*the claimed inconsistencies in the verdict could be resolved to read that the work clothing was not 'defective' because it was not unreasonably dangerous to the average consumer, but that [the defendant] was negligent in selling it without warnings of its flammability.*"

*Bragg*, 319 S.C. at 541, 462 S.E.2d at 327 (emphases added) (citations omitted) (quoting *Bigham*, 268 N.W.2d at 896–98).

However, in *Branham*, our supreme court counseled:

> While we agree that strict liability and negligence are not mutually exclusive theories of recovery, we caution against a broad reading of *Bragg* in this regard.  An analytical framework that turns solely on whether strict liability and negligence are mutually exclusive theories of recovery may miss the mark.  As noted, the negligence claim must have a fault-based element, which is not required for a strict liability claim.  *Where one claim is dismissed and a question arises as to the continuing viability of the companion claim, the critical inquiry is to*

> *ascertain the basis for the dismissal.* If one claim is dismissed and the basis of the dismissal rests on a common element shared by the companion claim, the companion claim must also be dismissed.

390 S.C. at 211–12, 701 S.E.2d at 9 (emphasis added). Fisher argues that the basis for the jurors' rejection of Rita's strict liability claim was a finding that Fisher's product was not unreasonably dangerous to the user. However, as we previously stated, this is speculative.

Rita also argues that in the present case, the circuit court's instructions to the jury concerning negligence presented it as "a broader theory of recovery than strict liability," and therefore, the verdicts for strict liability and negligence may be reconciled.[5] Rita specifically cites the following language that the circuit court included in its instruction on negligence but did not include in its strict liability instruction:

> A manufacturer who incorporates a defective *component* or part into its finished product and places the finished product in the stream of commerce is liable for injuries caused by defects in the component part. A defendant cannot, however, be liable for an allegedly defective product that it did not design, *recommend*, *specify*, require, manufacture, sell, or place in the stream of commerce.

(emphases added). Rita contends this language is "much broader than the strict liability instruction that the plaintiff must show that 'the product was defective and unreasonably dangerous when placed in the stream of commerce.'"[6] We agree that

---

[5] Fisher has not assigned error to any of the jury instructions given by the circuit court in this case. To the contrary, Fisher assigns error to the circuit court's omission of certain requested instructions, which we address below.

[6] The language cited from the strict liability instruction is

> If the products were defective and unreasonably dangerous *when they left the defendant's hands*, the defendant is liable even if all reasonable care was used in making and selling the products and even if the plaintiff did not buy the product from any of the defendants or enter in any contract with the defendant because the plaintiffs do not

if the jurors understood "the product" to be Fisher's valves rather than the asbestos gaskets themselves, they could perceive the above instruction to provide more flexibility than the strict liability instruction given because it would allow them to consider the gaskets as a component of Fisher's valves. Also, the presence of the words "recommend" and "specify" in the above instruction provides an additional basis for negligence liability that was not present (and should not have been present) in the circuit court's strict liability instruction—Fisher recommended asbestos gaskets as an option for use on their valves' external flanges even though they did not sell those particular gaskets.

These differences in the jury instructions for strict liability and negligence provide a logical reason for reconciling the verdicts on these claims. Having been presented with two additional considerations during the negligence instruction, i.e., a product's defective components and a defendant's product recommendation, the jurors had more flexibility in applying the circuit court's negligence instruction than it did in applying the circuit court's strict liability instruction. Further, the jurors' question concerning strict liability indicates they were struggling with that concept. Yet they had the benefit of the circuit court's instruction that Rita was not required to prove all three theories, i.e., strict liability, negligence, and breach of warranty, to recover from Fisher. They also had the benefit of the instruction that the focus in evaluating a strict liability claim is on the product and the focus in evaluating a negligence claim is on the defendant's conduct.

Moreover, the jurors' punitive damages award and finding for Rita on the breach of warranty claim (in addition to their finding for Rita on the negligence claim) clearly indicates their intent to hold Fisher accountable for Tommy's deadly exposure to the asbestos components of its valves and for its recommendation to use asbestos gaskets on the valves' external flanges.

Therefore, we conclude that the circuit court acted within its discretion in denying Fisher's new trial motion on the ground of inconsistent verdicts. *See Austin*, 387 S.C. at 49–50, 691 S.E.2d at 149 ("It is the duty of the court to sustain verdicts when a logical reason for reconciling them can be found." (quoting *Rhodes*, 249 S.C.

---

have to show negligence under the theory of strict liability. The plaintiffs must only prove the product was defective and unreasonably dangerous when it was placed in the stream of commerce.

(emphasis added).

at 530, 155 S.E.2d at 310)); *id.* at 49, 691 S.E.2d at 149 ("Whether to grant a new trial is a matter within the discretion of the trial judge, and this decision will not be disturbed on appeal unless it is unsupported by the evidence or is controlled by an error of law.").

## II.   Expert Testimony

Next, Fisher assigns error to the admission of testimony from Rita's causation experts on the grounds that (1) the testimony was unreliable and (2) it violated Rule 403, SCRE.  Fisher also asserts that in the absence of this testimony, there was insufficient evidence of proximate cause and, therefore, the circuit court should have granted its JNOV motion.  We will address these arguments in turn.

"The admission or exclusion of evidence is a matter within the [circuit] court's sound discretion, and an appellate court may only disturb a ruling admitting or excluding evidence upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.'"  *Thompson v. Swicegood*, 430 S.C. 648, 661, 845 S.E.2d 920, 926–27 (Ct. App. 2020) (quoting *Burke v. Republic Parking Sys., Inc.*, 421 S.C. 553, 558, 808 S.E.2d 626, 628 (Ct. App. 2017)). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law."  *Id.* at 661, 845 S.E.2d at 927 (quoting *Burke*, 421 S.C. at 558, 808 S.E.2d at 628); *see also Haselden v. Davis*, 341 S.C. 486, 497, 534 S.E.2d 295, 301 (Ct. App. 2000) ("Absent a showing of a clear abuse of that discretion, the [circuit] court's admission or rejection of evidence is not subject to reversal on appeal.").  We will now address what the law requires to establish causation in an asbestos case.

Whether the theory under which a products liability plaintiff seeks recovery is negligence, strict liability, or breach of warranty, it is necessary to show "the product defect was the proximate cause of the injury sustained." *Bray v. Marathon Corp.*, 356 S.C. 111, 116, 588 S.E.2d 93, 95 (2003).  "Proximate cause requires proof of both causation in fact and legal cause, which is proved by establishing foreseeability." *Id.* at 116–17, 588 S.E.2d at 95.  "Ordinarily, the question of proximate cause is one of fact for the jury[,] and the [circuit court's] sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence." *Small*, 329 S.C. at 464, 494 S.E.2d at 843.

Further, to account for multiple possible sources of the plaintiff's exposure to asbestos in a workplace setting, the law requires the plaintiff to show "more than a

casual or minimum contact with the product"[7] yet stops short of requiring the plaintiff to eliminate causation from all possible sources other than the defendant's product.[8] This compromise in the jurisprudence governing asbestos litigation has been labeled "the substantial factor test," and it has been adopted in most United States jurisdictions:[9] If the plaintiff can show his "exposure to a specific product on a regular basis over some extended period of time in proximity to where [he] actually worked," the jury may draw from the circumstantial evidence a reasonable inference of that product's "substantial causation" of the plaintiff's illness. *Henderson v. Allied Signal, Inc.*, 373 S.C. 179, 185, 644 S.E.2d 724, 727 (2007); *see also Lohrmann*, 782 F.2d at 1158, 1162 (applying Maryland law to a pipefitter's products liability claims

---

[7] *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir. 1986).

[8] *See Tort Law — Expert Testimony in Asbestos Litigation — District of South Carolina Holds the Every Exposure Theory Insufficient to Demonstrate Specific Causation Even If Legal Conclusions Are Scientifically Sound. — Haskins v. 3M Co.* (hereinafter *Asbestos Litigation*), 131 HARV. L. REV. 658, 658–59 (2017) (explaining that courts presiding over asbestos litigation have departed from traditional tort standards to overcome evidentiary hurdles inherent in these cases and highlighting the substantial factor test as a departure from requiring the plaintiff to show that he would not have developed mesothelioma *but for* exposure to the defendant's product); David E. Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 BROOK. L. REV. 51, 52 (2008) ("[W]ith regard to cases in which a plaintiff alleges injury after exposure to a toxin from multiple sources, a given defendant may only be held liable if the plaintiff proves by a preponderance of the evidence that exposure to that defendant's products was a 'substantial factor' in causing that injury."); *id.* at 55 ("Assuming the plaintiff is able to show that his disease was more probably than not caused by asbestos exposure, he still has to prove that a particular defendant's asbestos-containing product was a 'proximate cause' of that injury to recover damages from that defendant."); *see also Rost v. Ford Motor Co.*, 151 A.3d 1032, 1050–51 (Pa. 2016) ("[I]n asbestos products liability cases, evidence of 'frequent, regular, and proximate' exposures to the defendant's product creates a question of fact for the jury to decide. *This [c]ourt has never insisted that a plaintiff must exclude every other possible cause for his or her injury*, and in fact, we have consistently held that *multiple substantial causes* may combine and cooperate to produce the resulting harm to the plaintiff." (emphases added) (footnote omitted) (citation omitted)).

[9] *See, e.g., Slaughter v. S. Talc Co.*, 949 F.2d 167, 171 (5th Cir. 1991) ("The most frequently used test for causation in asbestos cases is the 'frequency-regularity-proximity' test announced in [*Lohrmann*]."); *id.* at 171 n.3 (listing jurisdictions adopting the *Lohrmann* test).

and restating Maryland's substantial factor test: "To establish proximate causation . . . , the plaintiff must introduce evidence [that] allows the jury to reasonably conclude that it is more likely than not that the conduct of the defendant was a *substantial factor* in bringing about the result." (emphasis added)).

By eliminating the "but for" requirement for proximate cause applied in traditional tort cases, our asbestos jurisprudence has recognized it as an "insuperable barrier to many deserving plaintiffs"[10] while still requiring the plaintiff to show "more than a casual or minimum contact with the product,"[11] thereby "absolving defendants who were not responsible for plaintiffs' injuries."[12] In other words:

> Courts, building on the Restatement (Second) of Torts, have concluded that plaintiffs must provide sufficient evidence for a jury to conclude that exposure to the defendant's asbestos or asbestos-containing product was a "substantial factor" in promoting the disease. As the comments to the Restatement (Second) note, if other actors' conduct is the predominant factor in bringing the harm at issue, then a defendant's action is not a "substantial factor" in causing the harm, and thus it is not the legal cause of the harm.
>
> Asbestos plaintiffs have faced the problem that in most cases they were exposed to asbestos many years earlier and are unable to prove with any precision how much exposure they received from any particular defendant's products. Given that this could prove an insuperable barrier to many deserving plaintiffs, courts have overwhelmingly held that proximate cause in the asbestos context should be considered in light of the "frequency, regularity, proximity test" pioneered by the Fourth Circuit Court of Appeals in [*Lohrmann*]. This test attempts to reduce the evidentiary burden on plaintiffs while still absolving defendants who were not responsible for plaintiffs' injuries.

---

[10] Bernstein, 74 BROOK. L. REV. at 55.

[11] *Lohrmann*, 782 F.2d at 1162.

[12] David E. Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 BROOK. L. REV. 51, 56 (2008).

David E. Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 BROOK. L. REV. 51, 55–56 (2008) (footnotes omitted).

When the exposure occurred in an occupational setting, only the individual who contracted mesothelioma, or his co-workers, can provide the evidence necessary to meet the substantial factor test—an expert on medical causation will not purport to substitute his testimony on the science of medical causation for the legal standard that only evidence of the individual's occupational history can meet. *See Rost*, 151 A.3d at 1045 ("Ford has confused or conflated the 'irrefutable scientific fact' that every exposure cumulatively contributes to the total dose (which in turn increases the likelihood of disease), with the legal question under Pennsylvania law as to whether particular exposures to asbestos are 'substantial factors' in causing the disease. It was certainly not this [c]ourt's intention, in [its precedent], to preclude expert witnesses from informing juries about certain fundamental scientific facts necessary to a clear understanding of the causation process for mesothelioma, even if those facts do not themselves establish legal (substantial factor) causation."). As we explain below, the expert testimony in the present case reliably established medical causation, and the lay testimony provided the information necessary to meet the substantial factor test.

### A. Admissibility

#### 1. Reliability

Fisher asserts that both of Rita's medical causation experts testified that all asbestos exposures are the cause of a person's mesothelioma and this testimony does not meet the standard for reliability set forth in *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999). *See id.* at 20, 515 S.E.2d at 518 ("[T]he proper analysis for determining admissibility of scientific evidence is now under the SCRE. When admitting scientific evidence under Rule 702, SCRE, the [circuit court] must find the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable."); *id.* at 19, 515 S.E.2d at 517 (setting forth four of "several factors" a court should examine in considering the admissibility of scientific evidence: "(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with

recognized scientific laws and procedures").[13] We disagree with Fisher's characterization of the expert testimony.

Rita presented the testimony of Dr. Arnold Brody, a cell biologist,[14] and Dr. Arthur Frank, a physician specializing in occupational medicine.[15] Dr. Brody testified concerning how the inhalation of asbestos causes mesothelioma. As to latency periods,[16] Dr. Brody stated that most of them are from 30 to 50 or 60 years. Dr. Brody also stated that the consensus "among scientists who understand the literature is that all of the asbestos [fiber] varieties . . . cause mesothelioma."

Additionally, he explained that whether an individual develops mesothelioma from his or her exposure depends on that individual's personal susceptibility based

---

[13] *See also State v. Phillips*, 430 S.C. 319, 334, 844 S.E.2d 651, 658 (2020) (referencing the discussion in *Council* regarding the circuit court's gatekeeping role in determining the admissibility of expert testimony and its "responsibility to ensure the expert testimony meets the requirements of Rules 702 and 403[, SCRE]."); *id.* at 335 n.7, 844 S.E.2d at 659 n.7 (coining the phrase "*Daubert*/*Council* hearing" but neither departing from the *Council* standard for determining the reliability of scientific evidence nor explicitly adopting the standard set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).

[14] Dr. Brody is also an experimental pathologist, and he is a professor emeritus in the pathology department at Tulane University School of Medicine. For fifteen years, Dr. Brody worked at the National Institute of Environmental Health Sciences, which was "involved in understanding how agents in the environment cause human disease," and he spent almost his whole career studying asbestos. He has spoken internationally about asbestos on several occasions; written over 150 peer-reviewed papers, most of which address asbestos; and testified as an expert in numerous cases nationwide on how asbestos causes disease. *See, e.g., Startley v. Welco Mfg. Co.*, 78 N.E.3d 639 (Ill. App. 2017).

[15] Dr. Frank also has a doctorate in biomedical sciences. He has been a professor at Drexel University and other colleges and a consultant to federal agencies and private employers. He has published hundreds of peer-reviewed articles and testified in numerous mesothelioma cases nationwide. *See, e.g., Rost v. Ford Motor Co.*, 151 A.3d 1032, 1044 (Pa. 2016). In addition to performing cancer research at the National Cancer Institute, he participated in epidemiologic studies of asbestos-exposed populations.

[16] According to Dr. Brody, a latency period spans from the time of an individual's first exposure to a substance until he becomes ill as a result of all of his exposures to that substance.

on the response of his or her genetic defenses, and according to many government agencies, there is no known exposure level above background levels that is known to be safe. Dr. Brody described background levels of asbestos in the following manner:

> [W]e all have some asbestos in our lungs, not enough to cause disease, but as we walk around every day in our environment, wherever we live, there's what's called an ambient exposure. Ambient air is just what's all around us. And there are a few fibers sitting out in the air from products that release asbestos over the years or naturally occurring asbestos that may get in the air. And we inhale that asbestos over time.

Dr. Brody also explained that "cumulative dose" means the dose of a substance that enters and accumulates in the lungs over time, and that a cumulative dose is what causes disease. He testified that all exposures to that particular substance "*contribute* to the likelihood of getting a disease." (emphasis added).

Later, Dr. Frank testified, stating that (1) all of the varieties of asbestos fibers "can cause all of the [asbestos] diseases" and (2) this fact is well-established in the medical community. Dr. Frank explained that as an individual's cumulative dose increases, his risk of disease increases. He also testified that to establish a medical connection between asbestos exposure and the development of mesothelioma, three criteria must be met: (1) documentation of asbestos exposure; (2) a latency period of at least ten years; and (3) a proper diagnosis.

After having reviewed Tommy's medical records, Dr. Frank stated, "There's no question in this case that [Tommy] had [] mesothelioma." He also stated that the body of literature about the level of asbestos emitted when asbestos gaskets are removed from a valve indicates that significant levels of asbestos fibers are released when the gasket is removed using a hand wire brush or an electric-powered grinder, showing models from 2.1 to 31 fibers per cubic centimeter.[17] He explained that these levels could be as high as a million times more than background exposures.

Dr. Frank also explained that even high levels of asbestos fibers cannot be seen, and therefore, if one can see dust emanating from an asbestos product, "it's very likely that that dust is exceeding allowable levels" and "that's when you should

---

[17] Dr. Frank explained that a cubic centimeter is "about the size of a sugar cube."

particularly worry."  Dr. Frank further testified that over the course of a year, repeated exposure at even the current permissible exposure limit presents a mesothelioma risk.  According to Dr. Frank, OSHA's legal limit of exposure over an eight-hour working day is one-tenth of one fiber per cubic centimeter.

Dr. Frank acknowledged that many scientific organizations have indicated there is no known safe level of exposure to asbestos:  "Outside the world of litigation, there is no entity that I know of, no persons, no organizations that would say that they can identify a safe[] level of exposure to asbestos."  He explained that even at low levels of exposure, there is a risk for developing mesothelioma.  Based on the evidence of Tommy's occupational exposure, Dr. Frank concluded that during Tommy's years working as an instrument technician for Duke, his regular and frequent exposures, from a distance of ten feet or less, to the removal of asbestos gaskets from the flange face of Fisher valves using wire brushes and power grinders were a significant cause of Tommy's mesothelioma.  He stated that if Fisher valves had been the only source of Tommy's repeated exposures to asbestos during his entire life, that would have been sufficient to cause his mesothelioma.

Additionally, the affidavit of Dr. Frank was admitted into evidence.  In his affidavit, Dr. Frank noted that over fifty countries have banned the use of all forms of asbestos.  He also stated that a person's "cumulative exposure to asbestos contributes to the total dose of asbestos" and "[t]he total cumulative exposure combines to raise the risk of disease and ultimately, in someone with the disease, to cause a patient's mesothelioma."  He stressed:

> These are my medical and scientific opinions.  I am not offering *legal* opinions about whether an exposure is "significant" or "substantial" within the meaning of the law.  I can only offer opinions about the *medical* and *scientific* significance of an exposure.  Again, it must be remembered that an "exposure" is never a single fiber; as discussed throughout this affidavit, when someone breathes visible dust from an asbestos product, there may be millions or billions of asbestos fibers present.

(emphasis in original).

Fisher maintains that the expert testimony is unreliable because it employed the "each and every exposure" theory of causation, which espouses the view that

"'each and every breath' of asbestos is substantially causative of mesothelioma."[18] However, Rita's experts relied on the cumulative dose theory, and their reliance on basic medical facts in reaching their opinion is not the equivalent of testifying that "each and every exposure" was a substantial factor in causing Tommy's mesothelioma.[19]

---

[18] *See Rost*, 151 A.3d at 1044 ("[E]xpert testimony based upon the notion that 'each and every breath' of asbestos is substantially causative of mesothelioma will not suffice to create a jury question on the issue of substantial factor causation."); *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 31 (Pa. 2012) (noting the report of plaintiffs' causation expert concluded that each exposure is "a substantial contributing factor in the development of the disease that actually occurs" and did not assess the plaintiffs' individual exposure history "as this was thought to be unnecessary, given the breadth of the any-exposure theory" (emphasis removed)); *see also Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 846 (E.D.N.C. 2015) ("Also referred to as 'any exposure' theory, or 'single fiber' theory, it represents the viewpoint that, because science has failed to establish that any specific dosage of asbestos causes injury, every exposure to asbestos should be considered a cause of injury."). A significant number of jurisdictions have found the "each and every exposure" theory to be unreliable. *See, e.g.*, *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1177 (9th Cir. 2016); *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009); *Yates*, 113 F. Supp. 3d at 846 (listing jurisdictions); *In re New York City Asbestos Litig.*, 48 N.Y.S.3d 365, 370 (2017); *Betz*, 44 A.3d at 53 (stating that the trial court "was right to be circumspect about the scientific methodology underlying the any-exposure opinion. [The court] . . . was unable to discern a coherent methodology supporting the notion that every single fiber from among, potentially, millions is substantially causative of disease").

[19] This distinction was also made in *Rost*, 151 A.3d at 1045–46; *see also Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1301 (11th Cir. 2017) (holding that the district court did not abuse its discretion in admitting expert testimony stating "there is no evidence that there is a threshold level of exposure below which there is zero risk of mesothelioma" and "all 'significant' exposures to asbestos 'contribute to cause mesothelioma'"); *id.* (stating that the defendant mischaracterized the opinion of the plaintiff's expert "as essentially that 'any exposure' to asbestos is a substantial factor in causing mesothelioma, which it says makes his opinion scientifically unreliable. That is not what he said."); *id.* ("While [the plaintiff's expert] testified that all significant exposures to asbestos contribute to causing mesothelioma, he did not say that <u>any</u> exposure to asbestos is a substantial factor in causing mesothelioma, or even that every significant exposure causes it."); *id.* (stating that the expert's opinion "was

Further, the cumulative dose theory on which Rita's experts relied easily meets the legal standard for reliability. As to items (1) and (2) of the *Council* factors for determining reliability (publications, peer review, and prior application of the method to the type of evidence involved in the case), Dr. Frank's affidavit indicates that scientists have analyzed cumulative asbestos exposure in order to ascribe causation in numerous peer-reviewed, published epidemiological studies, case series, and case reports. These publications "reinforce the scientific consensus that each occupational and para-occupational exposure to asbestos *contributes* to the cumulative lifetime asbestos exposure and increases a person's risk of developing mesothelioma." (emphasis added). As to item (3) (quality control procedures used to ensure reliability), Dr. Frank and his peers have not limited their analyses to the epidemiology of a substance but have also considered other scientific data, such as genetics, host factors, immunologic status, the relationship between risk and the level of exposure, and the dose-response principle. Dr. Frank stated,

> It is precisely because scientists and physicians understand the limitations of epidemiology and how certain factors can bias studies toward a lack of statistical significance or finding of a point estimate of no increased risk[] that we look at the epidemiology of a substance *along with* the other scientific data described above. Each epidemiological study must be evaluated for its strengths and weaknesses, and decisions about cause and effect should only be made on reliable data.

(emphasis added).

As to item (4) (consistency of the method with recognized scientific laws and procedures), Dr. Frank stated that he follows the same weight-of-the-evidence methodology used by the International Agency for Research on Cancer, the World Health Organization, the National Institute for Occupational Safety and Health, and the Agency for Toxic Substances and Disease Registries in reaching his conclusions about the health effects of asbestos. He explained that the duties of these organizations are to evaluate the science and not to set policy. He also noted that occupational and environmental epidemiology "is a blunt instrument and is not, in most cases, well suited to examining *precise* dose-response relationships."

---

also based on an extensive knowledge of the facts in [the] case and was supported by scientific literature").

(emphasis added). Dr. Frank stated, "When examining the question of causation of sentinel diseases like mesothelioma[,][20] the scientific community recognizes case reports and case series reports are useful and valid tools."

We view the testimony concerning cumulative dose as background information essential for the jury's understanding of medical causation, which must be based on science. This presentation was not an attempt to supplant the *Henderson/Lohrmann* test.[21] Further, Dr. Frank supplemented this background information with his assessment of the probable level of exposure, 2.1 to 31 fibers per cubic centimeter, for each asbestos gasket removal Tommy was in close proximity to. He further explained that this level is millions of times higher than background exposure. Both of Rita's experts were guided by the facts specific to Tommy's occupational exposure to Fisher's products in forming their opinions concerning causation. Further, Dr. Frank routinely relies on the following factors in examining a specific case:

> In determining the relative contribution of any exposures to asbestos above background levels, it is important to consider a number of factors, including: the nature of exposure, the *level* of exposure and the *duration* of exposure, whether a product gives off respirable asbestos fibers, the level of exposure, whether a person was *close to or far from the source* of fiber release, how *frequently* the exposure took place and how long the exposure lasted, whether engineering or other methods of dust control were in place, and whether respiratory protection was used.

(emphases added).

Based on the foregoing, we conclude that only when the science of cumulative exposure is distorted through the lens of the inapt "but for" analysis can it be viewed as unreliable. In any event, Fisher has failed to show there is a reasonable probability

---

[20] According to Dr. Frank's affidavit, a sentinel event is "a case of disease that, when it appears, signals the need for action."

[21] *See Henderson*, 373 S.C. at 185, 644 S.E.2d at 727 ("To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." (quoting *Lohrmann*, 782 F.2d at 1162–63)).

the jury's verdict was influenced by any testimony that could be reasonably characterized as espousing the each and every exposure theory. *See Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005) ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof.").

Nothing in the testimony of Rita's experts indicates they were seeking to substitute their opinions on the science underlying mesothelioma for the legal standard on causation. Further, the circuit court instructed the jury, in pertinent part,

> Under any products liability theory of recovery, strict liability, negligence, or breach of warranty, the plaintiff must establish that the product defect was a proximate cause of the injuries sustained. The plaintiff must prove that the plaintiff's exposure to the defendants' asbestos product was *of such a frequency, regularity, and duration that it was a substantial factor in bringing about the disease or injury*. . . .

(emphasis added).

With clear guidance from the circuit court's instructions on the law, which included the *Henderson/Lohrmann* standard, the jury was capable of distinguishing between the science-based testimony concerning asbestos exposure and the legal standard for establishing causation in the face of multiple possible sources of the plaintiff's exposure. Therefore, any possible presence of unreliable information in isolated portions of the expert testimony would have paled in comparison to the lay testimony concerning Tommy's occupational history.

## 2. Rule 403

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. "Evidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis . . . ." *Matter of Campbell*, 427 S.C. 183, 193, 830 S.E.2d 14, 19 (2019) (quoting *State v. Wilson*, 345 S.C. 1, 7, 545 S.E.2d 827, 830 (2001)). "The

determination of prejudice must be based on the entire record and will generally turn on the facts of each case." *Campbell*, 427 S.C. at 193, 830 S.E.2d at 19. Further, only exceptional circumstances justify reversing the circuit court's decision on this ground. *State v. Huckabee*, 419 S.C. 414, 423, 798 S.E.2d 584, 589 (Ct. App. 2017).

The same reasons for our conclusion that the challenged expert testimony was reliable compel us to conclude that this evidence does not tend to mislead the jury or suggest a decision on an improper basis and, therefore, there was no danger of unfair prejudice to Fisher. Only when the science of cumulative exposure is distorted through the lens of the inapt "but for" analysis can it viewed as misleading, confusing, or unfair to defendants. Therefore, the circuit court acted within its discretion in rejecting Fisher's argument that the testimony required exclusion pursuant to Rule 403. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (emphasis added)); *Huckabee*, 419 S.C. at 423, 798 S.E.2d at 589 (indicating that only exceptional circumstances justify reversing the circuit court's decision on this ground); *Thompson*, 430 S.C. at 661, 845 S.E.2d at 926–27 ("The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may only disturb a ruling admitting or excluding evidence upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.'"); *see also Haselden*, 341 S.C. at 497, 534 S.E.2d at 301 ("Absent a showing of a clear abuse of that discretion, the [circuit] court's admission or rejection of evidence is not subject to reversal on appeal.").

## B. Sufficiency of Causation Evidence

Because the expert testimony on causation was properly admitted into evidence, we reject Fisher's argument that Rita's evidence of causation was insufficient. *See Duckett ex rel. Duckett v. Payne*, 279 S.C. 94, 96, 302 S.E.2d 342, 343 (1983) ("[T]he appellant carries the burden of convincing this [c]ourt that the [circuit] court erred."); *see also Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003) ("In considering a JNOV, the [circuit court] is concerned with the existence of evidence, not its weight."); *id.* ("The jury's verdict must be upheld unless no evidence reasonably supports the jury's findings."); *Williams Carpet Contractors, Inc. v. Skelly*, 400 S.C. 320, 325, 734 S.E.2d 177, 180 (Ct. App. 2012) ("When ruling on a JNOV motion, the [circuit] court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party."); *id.* ("This court must follow the same

standard."); *id.* ("If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury." (quoting *Chaney v. Burgess*, 246 S.C. 261, 266, 143 S.E.2d 521, 523 (1965))); *Small*, 329 S.C. at 464, 494 S.E.2d at 843 ("Ordinarily, the question of proximate cause is one of fact for the jury and the [circuit court's] sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence."); *cf. Est. of Mims v. S.C. Dep't of Disabilities & Special Needs*, 422 S.C. 388, 403, 811 S.E.2d 807, 815 (Ct. App. 2018) (holding multiple inferences that could be drawn from the evidence precluded summary judgment and required a jury to determine the question of causation).

In addition to the expert testimony showing medical causation, the lay testimony meets *Henderson*'s substantial factor test. In a nutshell, for at least 15 years, Tommy's work regularly required him to be within close proximity to co-workers' removal of asbestos gaskets and packing from numerous Fisher valves, and he would have breathed the visible asbestos dust from this process. *See Henderson*, 373 S.C. at 185, 644 S.E.2d at 727 ("To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." (quoting *Lohrmann*, 782 F.2d at 1162–63)).

## III. Jury Instructions

Fisher contends the circuit court erred in declining to instruct the jury on the sophisticated intermediary doctrine, intervening cause, and the unavailability of punitive damages in breach of warranty claims. We will address each of these proposed instructions in turn, but first we consider the law concerning jury instructions in general.

"An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court abused its discretion." *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *Id.* "When instructing the jury, the trial court is required to charge only principles of law that apply to the issues raised in the pleadings and developed by the evidence in support of those issues." *Id.* at 390, 529 S.E.2d at 539. "Furthermore, the trial court is required to charge only the current and correct law of South Carolina." *Id.*

"In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." *State v. Marin*, 415 S.C. 475, 482, 783 S.E.2d 808, 812 (2016) (quoting *State v. Brandt*, 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011)). "The substance of the law is what must be instructed to the jury, not any particular verbiage." *Id.* (quoting *State v. Smith*, 315 S.C. 547, 554, 446 S.E.2d 411, 415 (1994)).

Accordingly, a refusal to give a requested instruction stating a sound principle of law applicable to the case at hand constitutes reversible error only when "the principle is not otherwise included in the charge." *Clark*, 339 S.C. at 390, 529 S.E.2d at 539. Further, "the [circuit] court is not required to instruct the jury on a principle of law that is irrelevant to the case as proved." *Id.* "Moreover, even if the [circuit] court erred in failing to give a requested instruction, the requesting party also must show that the error was prejudicial to warrant reversal on appeal." *Id.*; *see also Pittman v. Stevens*, 364 S.C. 337, 340, 613 S.E.2d 378, 380 (2005) ("A trial court's refusal to give a properly requested charge is reversible error only when the requesting party can demonstrate prejudice from the refusal.").

### A. Sophisticated Intermediary Doctrine

Fisher asserts that the circuit court should have charged the jury on the sophisticated intermediary doctrine because there was sufficient evidence to show that (1) Duke should have been aware of the danger associated with asbestos gaskets and (2) it was reasonable for Fisher to rely on Duke to warn its employees of this danger.[22] In our view, the evidence in the present case is insufficient to require a jury instruction on this doctrine.

---

[22] A November 21, 1984 script for an asbestos safety course provided to employees by Duke's construction department indicates Duke knew of the dangers of asbestos insulation but was unaware of the dangers of removing asbestos gaskets from a valve:

> Actually, asbestos is used very little in Duke Construction today, mostly to insulate electrical cabinets and pack valves, and it is used in gasket material. Even so, the asbestos in these jobs is bonded, which means it produces virtually no dust.
>
> In the past, however, nonbonded asbestos has been used for insulation throughout the Duke system. So[,] there's a

"The [sophisticated intermediary] doctrine originated in the *Restatement Second of Torts*, section 388, comment n, . . . which addresses when warnings to a party in the supply chain are sufficient to satisfy the supplier's duty to warn." *Webb v. Special Elec. Co.*, 370 P.3d 1022, 1033 (Cal. 2016). "The Restatement drafters' most recent articulation of the sophisticated intermediary doctrine appears in the *Restatement Third of Torts, Products Liability*, section 2, comment i, at page 30. The drafters intended this comment to be substantively the same as section 388, comment n, of the *Restatement Second of Torts*." *Webb*, 370 P.3d at 1034. Comment i states, in pertinent part:

> There is *no general rule* as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly or may rely on the intermediary to relay warnings. *The standard is one of reasonableness in the circumstances*. Among the factors to be considered are the *gravity of the risks* posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user.

*Restatement (Third) of Torts: Prods. Liab.* § 2, cmt. i (Am. Law Inst. 1998) (emphases added).

Here, the gravity of the risks of lung cancer and death resulting from the inhalation of friable asbestos could not have been greater. Further, Fisher has not shown that placing a written warning on the outside of their valves or on the replacement gaskets it sold to Duke would have been infeasible or ineffective. Therefore, we are not convinced that these circumstances made it reasonable for a supplier of asbestos gaskets to rely on Duke to relay warnings to its employees. *See id.*; *Duckett*, 279 S.C. at 96, 302 S.E.2d at 343 ("[T]he appellant carries the burden of convincing this [c]ourt that the [circuit] court erred.").

----

good chance asbestos dust is present wherever old insulation is being removed.

Nonetheless, Fisher contends that it was reasonable to rely on Duke to comply with occupational safety laws because Duke "should have been aware of the alleged dangers of asbestos-containing gaskets."

Moreover, it is not enough to show that the supplier's reliance would have been reasonable—the supplier must also show that it actually relied on the intermediary to convey warnings to end users. *See Webb*, 370 P.3d at 1036 ("To establish a defense under the sophisticated intermediary doctrine, a product supplier must show not only that it warned or sold to a knowledgeable intermediary, but also that it *actually* and reasonably relied on the intermediary to convey warnings to end users. This inquiry will typically raise questions of fact for the jury to resolve unless critical facts establishing reasonableness are undisputed." (emphasis added)).[23]

Rita maintains that Fisher introduced no evidence that it actually relied on Duke to warn its employees about the danger of asbestos gaskets, and Fisher has not cited any evidence to that effect in its briefs. In fact, the testimony of Fisher's corporate representative, Ronald Dumistra, indicates that Fisher could not have relied on Duke to convey warnings to its employees because Fisher did not consider asbestos gaskets to be a health risk. In other words, Fisher's belief that asbestos gaskets posed no health risk is inconsistent with Fisher's claim that it relied on Duke to warn Tommy of the dangers of asbestos gaskets.

Based on the foregoing, Fisher has not carried its burden of convincing this court that the circuit court should have instructed the jury on the sophisticated intermediary doctrine. *See Clark*, 339 S.C. at 389, 529 S.E.2d at 539 ("When instructing the jury, the trial court is required to charge only principles of law that apply to the issues raised in the pleadings and *developed by the evidence* in support of those issues." (emphasis added)); *id.* at 390, 529 S.E.2d at 539 ("[T]he trial court is not required to instruct the jury on a principle of law that is irrelevant to the case *as proved*." (emphasis added)); *Duckett*, 279 S.C. at 96, 302 S.E.2d at 343 ("[T]he appellant carries the burden of convincing this [c]ourt that the [circuit] court erred.").

---

[23] *See also Lawing*, 415 S.C. at 225–26, 781 S.E.2d at 557 ("[T]he sophisticated user doctrine, which arose from comment *n* to section 388 of the Restatement (Second) of Torts, recognizes that a supplier may *rely* on an intermediary to provide warnings to the ultimate user if the reliance is reasonable under the circumstances. The sophisticated user doctrine is typically applied as a defense to relieve the supplier of liability for failure to warn *where it is difficult or even impossible for the supplier to meet its duty to warn the end user of the dangers associated with the use of a product*, and the supplier therefore *relies on the intermediary or employer* to warn the end user." (emphases added) (citation omitted) (footnote omitted)). Fisher did not show that it was difficult to warn Duke employees of the danger associated with the removal of asbestos gaskets from its valves or from the valves' external flanges.

### B. Superseding Cause

Next, Fisher asserts that the circuit court should have charged the jury on superseding cause because there was sufficient evidence to support such a charge and the foreseeability of the intervening acts of third parties was a fact question for the jury. Specifically, Fisher asserts a superseding cause charge was supported by evidence of (1) Duke's negligent failure to warn employees that friable asbestos was released from asbestos gaskets during the process of removing them from the valves' components or from their external flanges and (2) the existence of non-Fisher sources of asbestos dust in Tommy's workplace.

"The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 590, 784 S.E.2d 670, 676 (2016). "An intervening force may be a superseding cause that relieves an actor from liability, but *for there to be relief from liability, the intervening cause must be one that could not have been reasonably foreseen or anticipated*." *Id.* (emphasis added). "In other words, the intervening negligence of a third party will not excuse the first wrongdoer if such intervention ought to have been foreseen in the exercise of due care." *Id.* "In such case, the original negligence still remains active[] and a contributing cause of the injury." *Id.* (quoting *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 89, 502 S.E.2d 78, 83 (1998)).[24]

We agree with Fisher that foreseeability is normally a fact question for the jury. *See Steele v. Rogers*, 306 S.C. 546, 551, 413 S.E.2d 329, 332 (Ct. App. 1992) ("Ordinarily, foreseeability is a question of fact to be decided by the jury."). However, for Fisher's superseding cause defense to be successful, it would have to convince the jury that it was unforeseeable for (1) Duke to fail to warn Tommy that friable asbestos was released from asbestos gaskets during the process of removing

---

[24] The *Roddey* opinion also has language that does not fit asbestos cases in which the "but for" requirement of causation has been relaxed: "Accordingly, if the intervening acts are *set into motion by the original wrongful act* and are the foreseeable result of the original act, the 'final result, as well as every intermediate cause, is considered in law to be the proximate result of the first wrongful cause.'" 415 S.C. at 590–91, 784 S.E.2d at 676 (emphasis added) (quoting *Wallace v. Owens–Ill., Inc.*, 300 S.C. 518, 521, 389 S.E.2d 155, 157 (Ct. App. 1989)).

them from the valves' components or from their external flanges and (2) there to be non-Fisher sources of asbestos dust within Tommy's workplace. We view this case as one of those "rare or exceptional" cases in which the circuit court properly determined that, as a matter of law, both of these circumstances were foreseeable. *See Gause v. Smithers*, 403 S.C. 140, 150, 742 S.E.2d 644, 649 (2013) ("Only in rare or exceptional cases may the issue of proximate cause be decided as a matter of law." (quoting *Bailey v. Segars*, 346 S.C. 359, 367, 550 S.E.2d 910, 914 (Ct. App. 2001))).

When the circuit court made this determination, Fisher's own corporate representative had already testified that Fisher considered the gaskets in its valves, and the replacement gaskets it sold to Duke, to be safe once they left Fisher's supplier because the asbestos in them was encapsulated. In light of its own failure to anticipate the release of asbestos dust from grinding these gaskets, Fisher's claim that it could not have foreseen Duke's similar oversight lacks credibility. Despite Duke's obligation to comply with OSHA regulations, its unwitting noncompliance was foreseeable as a matter of law. Further, it is unrealistic to infer from the evidence that the existence of other sources of asbestos dust in Tommy's workplace was unforeseeable.

Moreover, we are not convinced that Fisher was prejudiced by the circuit court's failure to give a separate instruction on superseding cause. While instructing the jury on proximate cause, the circuit court discussed foreseeability in the following manner:

> Plaintiffs must also prove something called "legal cause." And that is proven by showing that the injury was foreseeable. And that means the injury occurred as the *natural and probable* consequence of defendants' negligence.
>
> The plaintiffs must prove that some injury from defendants' negligence was foreseeable. But they do not have to prove that the particular injury that occurred was foreseeable.
>
> However, *the defendant cannot be held responsible for something that could not be expected to happen*. There's more than one cause—there can be more than one cause.

Proximate cause does not mean the only cause. The defendants' actions can be a proximate cause of plaintiff's injury if defendants' conduct was at least one of the direct causes of the injury. Where two or more causes combine to produce the injury, [the] defendant is not relieved from liability for negligence because it's only responsible for one of the [causes]. It is sufficient that its negligence is a proximate cause without which the injury would not have resulted to a greater extent.

Consequently, if defendants' negligence is a proximate cause of an injury to another, the fact that the negligence of a third party occurred with its own -- that negligence of a third party occurred with its own negligence to produce the harm does not relieve it of liability. In such cases, each wrongdoer is in breach of the duty of care over the plaintiffs. And because the negligence of each occurred to produce the injury, they can all be liable.

Under South Carolina law, a defendant is entitled to assert that other persons or entities contributed to the alleged injury or damage. The matter of others' alleged fault causing the plaintiff's injury has been raised by the defendant. *It's proper for you to consider the actions of others*, but only so far as plaintiffs have met their burden of proof.

(emphases added). Therefore, even if the foreseeability of third-party negligence had been truly a question of fact in the present case, the above language advised the jury that an unforeseeable intervening force relieves the defendant from liability. *See Clark*, 339 S.C. at 389, 529 S.E.2d at 539 ("It is error for the trial court to refuse to give a requested instruction which states a sound principle of law when that principle applies to the case at hand, *and the principle is not otherwise included in the charge*." (emphasis added)); *State v. Marin*, 415 S.C. 475, 482, 783 S.E.2d 808, 812 (2016) ("In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." (quoting *State v. Brandt*, 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011))); *id.* ("The substance of the law is what must be instructed to the jury, not any particular verbiage." (quoting *State v. Smith*, 315 S.C. 547, 554, 446 S.E.2d 411, 415 (1994))).

Based on the foregoing, we affirm the circuit court's ruling on this issue. *See Duckett*, 279 S.C. at 96, 302 S.E.2d at 343 ("[T]he appellant carries the burden of convincing this [c]ourt that the [circuit] court erred.").

## C. Punitive Damages

Fisher also assigns error to the circuit court's failure to instruct the jury that it was impermissible to award punitive damages on a breach of warranty claim. Fisher asserts that this alleged error was reversible. We disagree.

First, even if we assumed that the circuit court should have given the requested instruction, Fisher was not prejudiced by this omission because the jury found for Rita on her negligence claim, which undoubtedly allows for a punitive damages award if the jury also finds the defendant's conduct was willful, wanton, or reckless. *See Taylor*, 324 S.C. at 221, 479 S.E.2d at 46 ("In order for a plaintiff to recover punitive damages, there must be evidence the defendant's conduct was willful, wanton, or in reckless disregard of the plaintiff's rights."); *Carter v. Beals*, 248 S.C. 526, 534, 151 S.E.2d 671, 675 (1966) (holding that causing a collision by violating certain statutes constituted actionable negligence and would justify punitive damages). Here, the jury found "by clear and convincing evidence" that Fisher's conduct was "willful, wanton, or reckless." Therefore, for this reason alone, we would affirm on this issue. *See Pittman*, 364 S.C. at 340, 613 S.E.2d at 380 ("A trial court's refusal to give a properly requested charge is reversible error only when the requesting party can demonstrate prejudice from the refusal.").

Additionally, we see no merit in the argument that the circuit court was required to give the requested instruction. Although Fisher cites *Rhodes v. McDonald*, 345 S.C. 500, 504–05, 548 S.E.2d 220, 222 (Ct. App. 2001), in support of its argument, *Rhodes* does not stand for the proposition that the requested instruction is required when the plaintiff's claims consist of a mix of tort and warranty claims. Further, Fisher has not cited any case law that requires such a specific instruction.

In *Rhodes*, the plaintiffs' claims against the defendants were breach of contract and breach of the implied warranties of merchantability, habitability, and fitness for a particular purpose. 345 S.C. at 501, 505 n.8, 548 S.E.2d at 221, 223 n.8. On appeal, the defendants assigned error to the circuit court's denial of their directed verdict motion "as to the unavailability of punitive damages on the breach of implied warranty claims." *Id.* at 503, 548 S.E.2d at 221. This court concluded that the circuit court should not have submitted the issue of punitive damages to the jury and, thus,

reversed the punitive damages award. *Id.* at 503–05, 548 S.E.2d at 221–23. The critical difference between *Rhodes* and the present case is that in *Rhodes*, none of the plaintiffs' claims allowed for a punitive damages award and, in the present case, the negligence claim allows for such an award.

Fisher asserts, "The parties and the trial court cannot assume the jury knew this specific legal principle and analyzed *only Fisher's negligence* in awarding punitive damages. The *only way* to prevent the jury from awarding punitive damages for the breach of warranty claim was for the trial court to instruct the jury that the law prohibits it." (emphases added). However, as unlikely as it would have been, had the jury found for Rita on *only* the breach of warranty claim (rejecting her negligence claim) and also awarded her punitive damages, the circuit court could have easily cured the prejudice to Fisher by granting a JNOV as to the punitive damages award. Further, the jury's focus should not have been on pigeonholing Fisher's recklessness. Rather, in considering the issue of punitive damages, the jury's sole focus should have been on whether there was clear and convincing evidence that Fisher's misconduct was willful, wanton, or with reckless regard for Tommy's rights. The jury should not have been expected to do more than simply follow this standard.

Based on the foregoing, Fisher has not carried its burden of convincing this court that the circuit court erred in declining to give the requested instruction. *See Duckett*, 279 S.C. at 96, 302 S.E.2d at 343 ("[T]he appellant carries the burden of convincing this [c]ourt that the [circuit] court erred."). Therefore, we affirm this ruling.

## IV. Apportionment

### A. Application of the South Carolina Contribution Among Joint Tortfeasors Act

We affirm the circuit court's ruling on Fisher's apportionment arguments pursuant to Rule 220(b), SCACR and the following authorities: S.C. Code Ann. § 15-38-15 (Supp. 2022) (allowing a defendant responsible for less than fifty percent of total fault to assert liability against other potential tortfeasors); *Burns v. State Farm Mut. Auto. Ins. Co.*, 297 S.C. 520, 522, 377 S.E.2d 569, 570 (1989) ("The cardinal rule of statutory construction is that we are to ascertain and effectuate the actual intent of the legislature."); *State v. Johnson*, 396 S.C. 182, 188, 720 S.E.2d 516, 520 (Ct. App. 2011) ("In interpreting a statute, the court will give words their plain and ordinary meaning[] and will not resort to forced construction that would

limit or expand the statute."); *S.C. Energy Users Comm. v. S.C. Pub. Serv. Comm'n*, 388 S.C. 486, 491, 697 S.E.2d 587, 590 (2010) ("Under the plain meaning rule, it is not the province of the court to change the meaning of a clear and unambiguous statute. Where the statute's language is plain, unambiguous, and conveys a clear, definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." (citation omitted)); *Singletary v. S.C. Dep't of Educ.*, 316 S.C. 153, 162, 447 S.E.2d 231, 236 (Ct. App. 1994) ("The intention of the legislature must be gleaned from *the entire section* and not simply clauses taken out of context." (emphasis added)); *CFRE, LLC v. Greenville Cty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011) (stating that a statute "must be read *as a whole* and sections [that] are part of the same general statutory law must be construed together and each one given effect" (emphasis added) (quoting *S.C. State Ports Auth. v. Jasper County*, 368 S.C. 388, 398, 629 S.E.2d 624, 629 (2006))); *id.* ("We therefore should not concentrate on isolated phrases within the statute."); *id.* ("Instead, we read the statute as a whole and in a manner consonant and in harmony with its purpose."); *id.* ("In that vein, we must read the statute so 'that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous,' for '[t]he General Assembly obviously intended [the statute] to have some efficacy, or the legislature would not have enacted it into law.'" (citation omitted) (alterations in original) (quoting *State v. Sweat*, 379 S.C. 367, 377, 382, 665 S.E.2d 645, 651, 654 (Ct. App. 2008))); *Smith v. Tiffany*, 419 S.C. 548, 557, 799 S.E.2d 479, 484 (2017) ("[T]he General Assembly took steps to protect nonsettling defendants by codifying a nonsettling defendant's right to argue the so-called empty chair defense in subsection (D) [of section 15-38-15].");  *id.* ("[A] critical feature of the statute is the codification of the empty chair defense—a defendant 'retain[s] the right to assert another potential tortfeasor, whether a party or not, contributed to the alleged injury or damages'—which necessarily contemplates lawsuits in which an allegedly culpable person or entity is not a party to the litigation (hence the chair in question being 'empty')." (first alteration added)).

## B. Constitutional Violations

We affirm the circuit court's ruling on Fisher's constitutional arguments pursuant to Rule 220(b), SCACR and the following authorities:  S.C. Code Ann. § 15-38-15(D) (Supp. 2022) (codifying a defendant's right to argue the "empty chair" defense); S.C. Code Ann. § 15-38-50(1) (2005) (allowing the application of a setoff from settlement proceeds to a compensatory damages award); *R.L. Jordan Co. v. Boardman Petroleum, Inc.*, 338 S.C. 475, 478, 527 S.E.2d 763, 765 (2000) (indicating that the standard for whether legislation violates the substantive due process protection afforded by Article I, section 3 of the South Carolina Constitution

is "[w]hether it bears a reasonable relationship to any legitimate interest of government"); *Worsley Companies, Inc. v. Town of Mount Pleasant*, 339 S.C. 51, 56, 528 S.E.2d 657, 660 (2000) ("Substantive due process protects a person from being deprived of life, liberty or property for arbitrary reasons."); *id.* ("A plaintiff must show that he was arbitrarily and capriciously deprived of a cognizable property interest rooted in state law."); *Fraternal Ord. of Police v. S.C. Dep't of Revenue*, 352 S.C. 420, 430, 574 S.E.2d 717, 722 (2002) (recognizing that for purposes of equal protection of the laws, "the determination of whether a classification is reasonable is initially one for the legislature and will not be set aside by the courts unless it is plainly arbitrary." (quoting *Gary Concrete Products, Inc. v. Riley*, 285 S.C. 498, 504, 331 S.E.2d 335, 338 (1985))); *Denene, Inc. v. City of Charleston*, 359 S.C. 85, 91, 596 S.E.2d 917, 920 (2004) ("If the classification does not implicate a suspect class or abridge a fundamental right, the rational basis test is used."); *id.* ("Under the rational basis test, the requirements of equal protection are satisfied when: (1) the classification bears a reasonable relation to the legislative purpose sought to be [e]ffected; (2) the members of the class are treated alike under similar circumstances and conditions; and[] (3) the classification rests on some reasonable basis."); *Doe v. State*, 421 S.C. 490, 505, 808 S.E.2d 807, 814 (2017) ("Those attacking the validity of legislation under the rational basis test of the Equal Protection Clause have the burden to negate every conceivable basis which might support it." (quoting *Boiter v. S.C. Dep't of Transp.*, 393 S.C. 123, 128, 712 S.E.2d 401, 403–04 (2011))); *Doctor v. Robert Lee, Inc.*, 215 S.C. 332, 335, 55 S.E.2d 68, 69 (1949) ("One who is injured by the wrongful act of two or more joint [tortfeasors] has the option of bringing an action against either one or all of them as [] defendants . . . . To allow a defendant against the will of the plaintiff to bring in other joint [tortfeasors] as defendants would deny the plaintiff the right to name whom he should sue."); *Tiffany*, 419 S.C. at 563, 799 S.E.2d at 487 ("[T]his right of the plaintiff to choose her defendant has been recognized in South Carolina jurisprudence for almost two hundred years."); *id.* at 556–57, 799 S.E.2d at 483–84 (explaining the policy goals underlying the legislature's enactment of the South Carolina Contribution Among Joint Tortfeasors Act); *Roschen v. Ward*, 279 U.S. 337, 339 (1929) ("A statute is not invalid under the Constitution because it might have gone farther than it did, or because it may not succeed in bringing about the result that it tends to produce."); *Riley v. Ford Motor Co.*, 414 S.C. 185, 196, 777 S.E.2d 824, 830 (2015) (stating that the South Carolina Contribution Among Joint Tortfeasors Act "represents the Legislature's determination of the proper balance between preventing double-recovery and South Carolina's 'strong public policy favoring the settlement of disputes.'" (quoting *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 346, 698 S.E.2d 559, 560 (2010))); *CFRE*, 395 S.C. at 74, 716 S.E.2d at 881 (stating that a statute "must be read as a whole and sections [that] are part of the same general statutory law must

be construed together and each one given effect" (quoting *S.C. State Ports Auth.*, 368 S.C. at 398, 629 S.E.2d at 629)); *id.* ("[W]e read the statute as a whole and in a manner consonant and in harmony with its purpose.").[25]

### C. Public Policy

We affirm the circuit court's ruling on Fisher's public policy argument pursuant to Rule 220(b), SCACR and the following authority: *Tiffany*, 419 S.C. at 559, 799 S.E.2d at 485 ("If the policy balance struck by the legislature in [the South Carolina Contribution Among Joint Tortfeasors] Act is to be changed, that prerogative lies exclusively within the province of the Legislative Branch.").

## V.    Setoff

Fisher contends that the circuit court erred by declining to grant a setoff in the full amount of Rita's settlement proceeds against the full amount of the jury's compensatory damages award because (1) Rita's allocation of the proceeds was unilateral and incomplete and (2) the circuit court failed to review the settlement documents. We agree that the circuit court should review the settlement documents and reconsider the respective amounts to be set off against the compensatory damages awards for Rita's three claims.

"The right to setoff has existed at common law in South Carolina for over 100 years." *Riley*, 414 S.C. at 195, 777 S.E.2d at 830. "Allowing setoff 'prevents an injured person from obtaining a double recovery for the damage he sustained, for it is almost universally held that there can be only one satisfaction for an injury or wrong.'" *Id.* (quoting *Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012)). "In 1988, these equitable principles were codified as part of the South Carolina Contribution Among Tortfeasors Act . . . ." *Id.* In particular, section 15-38-50 provides in pertinent part,

---

[25] We do not reach Fisher's argument that it was deprived of its right "to have a jury determine all triable issues" in violation of article I, section 14 of the South Carolina Constitution. The circuit court did not rule on this argument, and Fisher did not file a Rule 59(e) motion seeking the circuit court's ruling on it. Therefore, it is not preserved for review. *See, e.g.*, *Noisette v. Ismail*, 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991) (noting the circuit court did not explicitly rule on a particular argument, the appellant failed to show it made a Rule 59(e) motion on this ground, and, therefore, this court should not have addressed the argument).

> When a release or a covenant not to sue or not to enforce judgment is given *in good faith* to one of two or more persons liable in tort *for the same injury* or the same wrongful death . . . *it* . . . *reduces the claim against the others* to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater[.]

(emphases added). "Therefore, before entering judgment on a jury verdict, the court must reduce the amount of the verdict to account for any funds previously paid by a settling defendant, so long as the settlement funds were paid to compensate *the same plaintiff* on a claim for the *same injury*."[26] *Smith v. Widener*, 397 S.C. 468, 471–72, 724 S.E.2d 188, 190 (Ct. App. 2012) (emphases added). In other words, "[a] non-

---

[26] We reject Fisher's assertion that Rita's wrongful death and survival claims seek damages for a single injury. *See* S.C. Code Ann. § 15-5-90 (2005) ("Causes of action for and in respect to . . . any and all *injuries to the person* . . . shall survive both to and against the personal or real representative, as the case may be, of a deceased person . . . , any law or rule to the contrary notwithstanding.") (emphasis added); S.C. Code Ann. § 15-51-10 (2005) ("Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony."); *id.* § 15-51-20 ("Every such action shall be *for the benefit of the wife or husband and child or children of the person whose death shall have been so caused*, and, if there be no such wife, husband, child or children, then for the benefit of the parent or parents, and if there be none such, then for the benefit of the heirs of the person whose death shall have been so caused. Every such action shall be brought by or in the name of the executor or administrator of such person." (emphasis added)); *Riley*, 414 S.C. at 196, 777 S.E.2d at 830 (affirming a setoff that conformed to the allocation of damages between a wrongful death claim and a survival claim); *Jolly*, 435 S.C. at 670, 869 S.E.2d at 853 (explaining why wrongful death and survival are different claims for different injuries despite the fact that they were created out of the same set of facts); *Widener*, 397 S.C. at 473 n.1, 724 S.E.2d at 191 n.1 (citing *Bennett v. Spartanburg Railway, Gas & Electric Co.*, 97 S.C. 27, 29–30, 81 S.E. 189, 189–90 (1914) for the proposition that wrongful death and survival actions are different claims for different injuries).

settling defendant is entitled to credit for the amount paid by another defendant who settles *for the same cause of action*." *Riley*, 414 S.C. at 195, 777 S.E.2d at 830 (emphasis added) (quoting *Rutland*, 400 S.C. at 216, 734 S.E.2d at 145).

"When the settlement is for the same injury, the nonsettling defendant's right to a setoff arises by operation of law." *Widener*, 397 S.C. at 472, 724 S.E.2d at 190. "Under this circumstance, '[s]ection 15-38-50 grants the court no discretion . . . in applying a [setoff].'" *Id.* (quoting *Ellis v. Oliver*, 335 S.C. 106, 113, 515 S.E.2d 268, 272 (Ct. App. 1999)). On the other hand, when the settlement "involves more than one claim, the allocation of settlement proceeds between various causes of action impacts the amount a non-settling defendant may be entitled to offset." *Riley*, 414 S.C. at 196, 777 S.E.2d at 830; *see also Widener*, 397 S.C. at 473, 724 S.E.2d at 191 ("[W]hen the prior settlement involves compensation for a different injury from the one tried to verdict, there is no setoff as a matter of law.").

Here, prior to trial, the circuit court issued an order approving the settlement of Rita's wrongful death and survival claims against some of Fisher's co-defendants pursuant to S.C. Code Ann. § 15-51-42.[27] The circuit court also stated,

> I approve the attorney's fees and expenses and the distribution of 90 [percent] to the wrongful death claim and 10 [percent] to the survival claim. In addition, all future settlements in this case that are disbursed in the same manner (attorney's fees and costs are deducted as indicated above and the remaining is divided pursuant to the heir agreement) are approved.[28]

---

[27] Section 15-51-42(C)(1) provides that when "a wrongful death or survival action has been filed in state court and . . . the settlement agreement between the parties is reached before the matters reach trial, the personal representative shall petition the court in which the wrongful death or survival action has been filed" seeking approval of a proposed settlement.

[28] The circuit court and the parties have interpreted this language to mean that 90 percent of the settlement proceeds was allocated to the wrongful death claim and 10 percent of the proceeds was allocated to the survival claim. Rita does not assert that this allocation resulted from settlement negotiations with Fisher's co-defendants or was stipulated by the written release of her claims, and there is nothing in the record to indicate that the settling defendants agreed to any particular allocation of the proceeds, as contemplated by section 15-38-50. However, we are not prepared to reject the allocation approved by the circuit court solely on the ground that it was

The order indicated that Rita had not yet executed a release or received settlement proceeds, and therefore, the circuit court was unable to review the settlement documents before approving the settlement. After trial, Fisher filed a motion for setoff and requested to view the settlement documents. In response, Rita indicated that she had received a total of $2,805,000 in settlement proceeds. At the motions hearing, the circuit court reviewed a document Rita's counsel prepared showing a breakdown of what each settling defendant paid to Rita. However, the hearing transcript indicates the circuit court did not review the settlement agreements or releases. Instead, Rita's counsel represented to the circuit court that she had released all of her claims against the settling defendants.

The circuit court ruled that the allocation of 90 percent of the proceeds to the wrongful death claim was reasonable because Tommy had 14 more years of life expectancy and died a very painful death. The court also ruled that Rita was "well within [her] rights to allocate nothing to the loss of consortium." In its written order addressing Fisher's post-trial motions, the circuit court stated that its pre-trial approval of Rita's wrongful death and survival settlements "apportioned 90 [percent] of the settlement proceeds to wrongful death and 10 [percent] to survival." The circuit court determined that the setoff for wrongful death was $2,524,500, which eclipsed the $1 million awarded to Rita for that claim. The circuit court also determined that the setoff for the survival claim was $280,000.[29] The circuit court concluded that Fisher owed Rita "zero for wrongful death damages" and "$720,000 for survival damages." The circuit court also concluded that there was no setoff for loss of consortium "as that claim was not settled pre-trial by any defendants,"[30] and the total amount Fisher was responsible for was $1,720,000, plus punitive damages.

<hr>

"unilateral." Section 15-51-42 gives the circuit court authority to approve the settlement of wrongful death and survival claims, and this authority necessarily encompasses the allocation of the proceeds among those claims to effect a timely distribution of the proceeds to the statutory beneficiaries. Nonetheless, we question whether the pre-trial allocation among the two statutory claims may be incomplete for purposes of a post-trial setoff against the respective damages awards for all three claims given that Rita had also released the settling defendants from her claim for loss of consortium.

[29] Our calculation yields $280,500.

[30] As previously stated, Rita's trial counsel represented to the circuit court that Rita settled all of her claims against the settling defendants, and appellate counsel confirmed this during oral arguments before this court.

Initially, we note that the circuit court had a responsibility to review the settlement documents *in camera* to verify not only the amount of the settlement and its terms but also whether it was "given in good faith." § 15-38-50 ("When a release or a covenant not to sue or not to enforce judgment is given *in good faith* to one of two or more persons liable in tort for the same injury or the same wrongful death: (1) it . . . reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and (2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor." (emphasis added)); *Huck v. Oakland Wings, LLC*, 422 S.C. 430, 438, 813 S.E.2d 288, 292 (Ct. App. 2018) (remanding a case to the circuit court to review a settlement agreement and determine if a defendant was entitled to setoff). In *Huck*, this court held,

> To determine if the nonsettling tortfeasor is entitled to a setoff as a preliminary matter, the documents must be reviewed to determine if their terms shield the settling tortfeasor from the requirements of section 15-38-50(2). Therefore, the court must review the documents to determine the amount of the settlement and its terms. Under section 15-38-50, the court also must determine if the release or covenant was "given in good faith." Because the trial court did not conduct such a review, we remand the case for the trial court to look at the settlement agreement and determine if [the nonsettling defendant] is entitled to a setoff.

*Id.* Therefore, we are compelled to remand this issue for the circuit court's *in camera* review of the settlement documents in accordance with *Huck*.

We also view the pre-trial allocation as potentially incomplete for purposes of a post-trial setoff because it did not reflect any consideration necessarily given for Rita's release of her loss of consortium claim. *See* § 15-38-50 ("When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death . . . it . . . reduces the claim against the others *to the extent of* any amount stipulated by the release or the covenant, or in *the amount of the consideration paid for it*, whichever is the greater[.]" (emphases added)); *e.g., Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 406, 581 S.E.2d 161, 166 (2003) ("The necessary elements of a contract are an offer, acceptance, and valuable consideration."). This may be due

to the circuit court's stated assumption in its written orders that Rita did not release her loss of consortium claim against the settling defendants.

We acknowledge that our case law favors a plaintiff's ability to apportion settlement proceeds "in the manner most advantageous to [her]."[31] *Riley*, 414 S.C. at 197, 777 S.E.2d at 831. However, we hesitate to read *Riley* too broadly. The principle underlying the right to a setoff, avoiding a double recovery, still requires the settlement of claims and allocation of the proceeds to be grounded in good faith. *See* § 15-38-50 ("When a release or a covenant not to sue or not to enforce judgment is given *in good faith* to one of two or more persons liable in tort for the same injury or the same wrongful death . . . it . . . reduces the claim against the others *to the extent of any amount stipulated by the release* or the covenant, *or in the amount of the consideration paid for it*, whichever is the greater[.]" (emphases added)).

As we read *Riley*, it appears that unlike the allocation in the present case, that allocation was specified in the settlement documents as contemplated by section 15-

---

[31] In *Riley*, our supreme court concluded that this court erred in reapportioning settlement proceeds on the basis that the allocation to which the plaintiff and settling defendants agreed "did not seem to be, in the court of appeals' view, proportionately reasonable" and "may have been advantageous to the [plaintiff]." 414 S.C. at 196, 777 S.E.2d at 830–31. The supreme court stated: "Indeed, we agree with the approach taken by the Illinois Court of Appeals, which stated:

> A plaintiff who enters into a settlement with a defendant gains a position of control and acquires leverage in relation to a nonsettling defendant. This posture is reflected in the plaintiff's ability to apportion the settlement proceeds in the manner most advantageous to it. Settlements are not designed to benefit nonsettling third parties. They are instead created by the settling parties in the interests of these parties. If the position of a nonsettling defendant is worsened by the terms of a settlement, this is the consequence of a refusal to settle. A defendant who fails to bargain is not rewarded with the privilege of fashioning and ultimately extracting a benefit from the decisions of those who do.

414 S.C. at 197, 777 S.E.2d at 831 (quoting *Lard v. AM/FM Ohio, Inc.*, 901 N.E.2d 1006, 1019 (Ill. App. 2009)).

38-50.  Our supreme court reversed this court's re-allocation, concluding that this court erred in disturbing the settling parties' agreement "*solely* because the apportionment may have been advantageous to the [plaintiff]."  414 S.C. at 196, 777 S.E.2d at 831 (emphasis added)); *see id.* at 197, 777 S.E.2d at 831 ("Settling parties are naturally going to allocate settlement proceeds in a manner that serves their best interests. That fact alone is insufficient to justify appellate reapportionment for the *sole* purpose of benefitting [the defendant]." (emphasis added)).

Further, nothing in *Riley* suggests that the circuit court has the discretion to completely deny a setoff against a verdict for a particular claim after the plaintiff receives funds from a co-defendant to settle the same claim.  *See Widener*, 397 S.C. at 472, 724 S.E.2d at 190 ("When the settlement is for the same injury, the nonsettling defendant's right to a setoff arises by operation of law.  Under this circumstance, '[s]ection 15-38-50 grants the court no discretion . . . in applying a [setoff].'" (citation omitted) (quoting *Ellis v. Oliver*, 335 S.C. 106, 113, 515 S.E.2d 268, 272 (Ct. App. 1999)).  Rather, *Riley* indicates that the circuit court has discretion as to merely the amount to be setoff against the verdict when the settlement involves multiple claims.  414 S.C. at 196, 777 S.E.2d at 830 (stating that when the settlement "involves more than one claim, the allocation of settlement proceeds between various causes of action impacts the amount a non-settling defendant may be entitled to offset").

Unlike the allocation in *Riley*, the unilateral allocation in the present case did not reflect any consideration given by the settling defendants for Rita's release of her loss of consortium claim.  As we previously stated, the circuit court may have simply been under the impression that Rita did not release her loss of consortium claim against the settling defendants.  In any event, we recognize that the specific amount to setoff against the compensatory damages award for loss of consortium is left to the circuit court's discretion as the three claims released by Rita respectively seek different types of damages and have different, overlapping beneficiaries.

Based on the foregoing, we remand for the circuit court's *in camera* review of the settlement documents in accordance with *Huck* and its reconsideration of the respective amounts to be set off against the jury's compensatory damages awards for Rita's three claims.

## VI.   Discovery Sanctions

Finally, Fisher argues the circuit court erred in imposing discovery sanctions on it because Fisher did not act in bad faith but merely sought to proffer expert testimony for purposes of appellate review.[32] We disagree.

"The entire thrust of the discovery rules involves full and fair disclosure, 'to prevent a trial from becoming a guessing game or one of surprise for either party.'" *Samples v. Mitchell*, 329 S.C. 105, 113, 495 S.E.2d 213, 217 (Ct. App. 1997) (quoting *State Highway Dep't v. Booker*, 260 S.C. 245, 252, 195 S.E.2d 615, 619 (1973)). "Essentially, the rights of discovery provided by the rules give the trial lawyer the means to prepare for trial, and when these rights are not accorded, prejudice must be presumed." *Id.* at 113–14, 495 S.E.2d at 217. When a party disobeys a discovery order, Rule 37(b)(2) of the South Carolina Rules of Civil Procedure authorizes the circuit court to "make such orders in regard to the [disobedience] as are just." This language gives the circuit court discretion in the imposition of sanctions. *See also Davis v. Parkview Apartments*, 409 S.C. 266, 281, 762 S.E.2d 535, 543 (2014) ("The imposition of sanctions is generally entrusted to the sound discretion of the [c]ircuit [c]ourt." (quoting *Downey v. Dixon*, 294 S.C. 42, 45, 362 S.E.2d 317, 318 (Ct. App. 1987)).

"[A]n appellate court will not interfere with 'a trial court's exercise of its discretionary powers with respect to sanctions imposed in discovery matters' unless the court abuses its discretion." *Id.* (quoting *Karppi v. Greenville Terrazzo Co., Inc.*, 327 S.C. 538, 542, 489 S.E.2d 679, 681 (Ct. App. 1997)). "An 'abuse of discretion' may be found by this [c]ourt where the appellant shows that the conclusion reached by the [circuit] court was without reasonable factual support, resulted in prejudice to the right of appellant, and, therefore, amounted to an error of law." *Id.* at 282, 762 S.E.2d at 543 (quoting *Dunn v. Dunn*, 298 S.C. 499, 502, 381 S.E.2d 734, 735 (1989)); *see also QZO, Inc. v. Moyer*, 358 S.C. 246, 256, 594 S.E.2d 541, 547 (Ct. App. 2004) (same). "The appealing party bears the burden of demonstrating that the [circuit] court abused its discretion." *Davis*, 409 S.C. at 282, 762 S.E.2d at 543; *see also QZO*, 358 S.C. at 256, 594 S.E.2d at 547 (same).

Here, the circuit court's post-trial sanctions order related to Fisher's conduct and communications with opposing counsel throughout the six weeks prior to trial, which was scheduled to begin on January 14, 2019. On November 28, 2018, a pathologist hired by Fisher, Dr. Timothy Oury, sent Fisher's counsel a report

---

[32] Fisher has not appealed the issue for which it sought to proffer testimony, i.e., the circuit court's ruling excluding the testimony of Dr. Timothy Oury, Fisher's pathology expert. *See infra*.

concerning his examination of several slides of lung tissue preserved from Tommy's treatments. Dr. Oury concluded, "[W]hile the finding of a pleural plaque in the pathology specimen suggests this may be an asbestos associated mesothelioma, the lack of bilateral parietal pleural plaques and the lack of asbestos bodies on histologic sections suggest that *prior asbestos exposure may not have contributed to his mesothelioma*." (emphasis added). Dr. Oury recommended "digestion studies to more rigorously determine if asbestos did or did not contribute to his tumor."[33]

Fisher's counsel then initiated a discussion with Rita's counsel concerning the digestion study. The communication between two attorneys for Fisher and three attorneys for Rita began with a phone call and follow-up letter and turned to an e-mail exchange in which Rita's counsel reminded Fisher's counsel of a case management order prohibiting the destruction of tissue without an agreement of the parties or a court order.[34]

Counsel for the parties continued to exchange e-mails in an attempt to come to an agreement on the protocol for dividing the tissue so that Rita could respond to Fisher's digestion study with her own study. However, Rita's counsel, Theile McVey, also advised Fisher's counsel, Yancey McLeod, that she would "need to send the protocol to [Rita's expert] and get him to sign off. Then you can do the division of tissue and send." Accordingly, in a follow-up e-mail sent on December 10, 2018, Mr. McLeod set forth the protocol Dr. Oury would use for the tissue division and digestion. On that same day, Mr. McLeod instructed Dr. Oury to proceed with the study, contrary to Ms. McVey's previous statement that Rita's expert would have to "sign off" on the protocol—Mr. McLeod later told the circuit court in a pre-trial hearing that he had considered the agreement to be finalized once he sent the December 10 e-mail. Ms. McVey responded that there "wasn't an agreement when [Mr. McLeod] sent the protocol" and "[h]e sent the protocol on the 10th, but we didn't have a chance to process it until the 11th."

---

[33] Tissue digestion involves "dissolving the organic tissue in acid to leave behind inorganic particulates." Christopher Meisenkothen, *A Shifting Paradigm? Deschenes v. Transco and the Precarious New Landscape of Concurrently Developing Disease in Connecticut's Workers' Compensation Jurisprudence*, 84 Conn. B.J. 339, 374 (2010).

[34] According to the circuit court, a "case management order in place since June 25, 2015, mandated that a party could not destroy tissue without the agreement of the parties or court order."

Beginning at 3:25 p.m. on December 11, 2018, counsel for the parties continued their e-mail exchange to clarify their intentions. The final e-mail in this exchange was from Rita's second attorney, Jonathan Holder, to Fisher's second attorney, Tim Bouch, and Rita's third attorney, Trey Branham. Mr. Holder stated,

> We need a [third] party (uninterested) to split evenly the material already in Defense's possession. That is the only way to be sure we are comparing apples to apples, then we can each have our experts do a digestion. But we need to split ASAP to [have] any hope at this getting completed prior to trial.

Mr. Holder copied Mr. McLeod and Ms. McVey on this e-mail. Nonetheless, nothing in the record shows that Fisher's counsel responded to this e-mail, and Fisher indicated in its brief that it did not consider this last e-mail to be part of the agreement on the tissue division protocol—Fisher referenced this e-mail in its brief and stated, "Fisher proceeded based on its understanding that the parties had agreed only to an even division of the tissue as Mr. Branham and Mr. McLeod confirmed in their December 11 emails."

Once Dr. Oury received the tissue in paraffin blocks from Emory University, he circled the parts to be divided and sent them to the RJ Lee Group on December 10 "to perform digestion studies with the instruction to use only ½ of the tissue circled in . . . two blocks to make a single filter." RJ Lee Group performed the digestion and sent to Fisher's counsel the unused tissue samples and a report of its findings. In turn, Fisher's counsel sent the unused tissue samples to Rita's counsel. RJ Lee Group also sent a report and "1/2 of the filter" to Dr. Oury, who in turn examined the "1/2 filter" and sent a report of his findings to Fisher's counsel. Both reports were dated December 18, 2018.

After receiving the unused tissue samples from Fisher's counsel, Mr. Holder responded via e-mail on December 17, 2018, by objecting to the involvement of RJ Lee Group on the ground that it was not an uninterested third party. Mr. Holder asked Fisher's counsel if there was enough tissue left for a digestion by an uninterested third party. Fisher's counsel did not respond to this request.

On December 21, 2018, Fisher served opposing counsel with a formal notice that Fisher would be taking a "trial preservation deposition" of Dr. Oury on January 8, 2019. Subsequently, Rita submitted a motion in limine to strike the tissue digestion study and "preclude" any related evidence. The motion stated, in part, that

Fisher did not follow the condition that the tissue must be divided by an uninterested third party and the division was performed in a manner to prevent Rita's expert from having a sufficient amount of digestible tissue. The motion also stated that Fisher waited "until the eve of trial, after the deadline for all depositions of all Defendants' expert witnesses[,] to introduce for the first [time] the results of a tissue digestion that could have been . . . performed for three years prior to trial" and this delay placed an undue burden on Rita by requiring her to hire a new expert witness to perform a tissue digestion and to be available for a deposition and trial.

Rita also sought an order of protection "from the scheduling of the deposition." Rita based this motion on several grounds: (1) the scheduled deposition would occur one day before the pre-trial hearing; (2) it overlapped deposition dates already set in the case; (3) Fisher declined Rita's requests to reschedule Dr. Oury's trial preservation deposition and to conduct a discovery deposition; (4) Fisher refused to provide Rita's counsel with the "filters or grids . . . to review RJ Lee's work"; (5) Fisher failed to make RJ Lee's scientist available for deposition; (6) the tissue was "destroyed in direct violation of the agreement of [the] parties to have it divided by an independent third party"; (7) Fisher waited over three years to seek an agreement on tissue destruction; (8) the tissue was not evenly split; and (9) Rita was also seeking to exclude the tissue digestion from evidence at trial, and, thus, any deposition of Dr. Oury should occur after the pre-trial hearing.

Attached to the written motion were copies of photographs purporting to show that "more than half of the tissue was taken from the circled area leaving Plaintiffs with insufficient tissue to digest." Fisher responded with an affidavit from RJ Lee's scientist stating that he cut and removed no more than half of the tissue for his own study and there remained sufficient tissue to perform an additional digestion study. On January 7, 2019, the circuit court filed an order granting Rita protection from the scheduling of the deposition. In this order, the circuit court stated, "The [c]ourt will address the admissibility of the testimony for trial and rescheduling of the Oury deposition, if necessary, at the pre-trial hearing scheduled for January 9, 2019."

Unbeknownst to Rita or the circuit court, Fisher's counsel met with Dr. Oury and a court reporter on January 8, 2019 to take Dr. Oury's "Sworn Statement," in the question and answer format typical of a deposition. During the pre-trial hearing on the following day, Fisher's counsel neither advised the circuit court that they had taken Dr. Oury's "Sworn Statement" nor sought to proffer it. As to her motion to exclude the tissue digestion study, Rita's counsel stated at the pre-trial hearing that RJ Lee Group was an "incredibly biased[] third party who solely represents defendants . . . and has been criticized by . . . the Environmental Protection

Agency[] in public documents . . . ."  Counsel also stated that Rita's new expert indicated he did not have enough tissue to work with and allowing Fisher to introduce evidence on the tissue digestion would require Rita to depose Dr. Oury, RJ Lee's scientist, and Rita's own tissue digestion expert within just a few days before trial, which was scheduled to begin on January 14.

As the pre-trial hearing continued, Fisher's counsel admitted that the tissue had been divided "just after noon" on December 11, before the further e-mail exchange between counsel for the parties, but claimed that the parties "had already come to an agreement."  Fisher's counsel also claimed that his December 10 e-mail advising Rita's counsel of the protocols was "just confirming the agreement."  Fisher claimed that the parties had already come to an agreement when Mr. Holder sent the e-mail stating that the tissue division had to be performed by a disinterested third party and that prior to that e-mail, Mr. Holder had not been involved in the e-mail exchanges regarding the tissue division:  "Mr. Holder was not even a part of the communications between me and [Ms. McVey] and Mr. Branham about how we were going to handle this."  However, Mr. Holder was involved in the initial phone call and follow-up letter, and he was copied on all subsequent e-mails between counsel for the parties.

The circuit court concluded that there was no meeting of the minds regarding the tissue division and digestion study and Fisher's counsel should have immediately responded to Mr. Holder's request to start over with unused tissue from Emory to be divided by an uninterested third party rather than a defense expert.  The circuit court granted Rita's motion, striking the digestion and precluding Dr. Oury from "testifying regarding the results of the tissue digestion or that a tissue digestion was ever performed."  However, the court left open the possibility of admitting testimony regarding a new digestion:  "To the extent that the Defendants can show that there is more viable tissue, they are not precluded from seeking to reach an agreement from [Rita] to complete a second digestion."  Fisher made no such effort.

Near the conclusion of trial, Fisher attempted to proffer Dr. Oury's "Sworn Statement" for the record.  The circuit court stated that it was blindsided and it did not consider the purported sworn statement to be an appropriate proffer because it was not submitted before the court issued the pre-trial order excluding the tissue digestion from evidence.  The circuit court also noted that (1) the statement was truly a trial preservation deposition that the court had prohibited; (2) Fisher misled the court at the pre-trial hearing by staying silent about the sworn statement/deposition; (3) neither the court nor Rita's counsel was notified that the sworn statement/deposition occurred until the end of trial; and (4) the expansion of Dr.

Oury's December 18 report via the sworn statement/deposition was subject to Fisher's ongoing obligation under discovery rules to provide opposing counsel with supplemental material generated by their expert. Ultimately, the circuit court allowed the sworn statement/deposition to be used as a proffer but indicated that it would likely impose sanctions on Fisher in a post-trial order if requested by Rita. After trial, Rita submitted a motion for sanctions against Fisher for discovery abuse and violation of the circuit court's order of protection.

The circuit court granted the motion, stating:

> Here, Fisher Controls displayed a pattern and practice of disregard for this state's longstanding Discovery and Scheduling Order, the case management order and established case deadlines, the South Carolina Rules of Civil Procedure, and orders from this [c]ourt. In the handling of this issue with the tissue digestion alone, Fisher Controls repeatedly violated court orders. Fisher Controls offered no explanation for waiting until the eve of trial, years after obtaining Thomas Glenn's pathology, to perform a tissue digestion analysis. The case management order in place since June 25, 2015, mandated that a party could not destroy tissue without the agreement of the parties or court order. Fisher Controls ignored this order. Next, Fisher Controls wholly disregarded this [c]ourt's order prohibiting Dr. Timothy Oury's deposition. Although Fisher Controls labeled the deposition a "sworn statement," the statement is clearly a deposition submitted under a label which would not immediately invoke the [c]ourt's ire. The statement was transcribed by an official [c]ourt [r]eporter on the day and at the time that Fisher Controls had originally scheduled Dr. Oury's deposition— a deposition prohibited by an Order of Protection from this [c]ourt. Further, the statement consists of more than just a rote recitation of Dr. Oury's new causation conclusions. Counsel for Fisher Controls engaged in a lengthy examination of Dr. Oury and asked that he not only disclose his new opinions but explain the bases for his new opinions. The problematic nature of this conduct is compounded by the fact that Dr. Oury's new opinions were based on the results of the unauthorized tissue digestion—

one in which the tissue was unequally divided and left the Plaintiff without sufficient tissue to conduct her own digestion. Moreover, Fisher Controls, despite being represented at pre-trial hearings and during multiple days of trial, concealed its conduct regarding its violation of [c]ourt [o]rders until the close of the presentation of evidence at the trial in this matter. The failure to produce this information during the pendency of trial, denying counsel information alleged to be "critical," is an abuse of the discovery and trial processes. It also left Plaintiff unable to respond to Fisher Controls' attempted proffer. This pattern and practice of discovery abuse is unacceptable for any party. But for Plaintiffs counsel's request to limit sanctions to a written order, greater sanctions would have been imposed as the gravity and repetitive disregard for the rules of court would have warranted substantial sanctions.

As a result of Fisher Controls' abuse of the discovery and trial processes, this [c]ourt, in lieu of more serious sanctions, finds as follows:

1.    Fisher Controls has intentionally and deliberately violated [o]rders from this [c]ourt regarding the discovery and trial processes which created a presumed prejudice of Plaintiff's ability to accurately and fairly present her case to the jury in this matter; and

2.    The record shall reflect that Fisher Controls has repeatedly and deliberately engaged in a pattern and practice of sanctionable conduct.

For the foregoing reasons, Plaintiff is entitled to the sanctions as outlined above.

Fisher has not carried its burden of showing that the circuit court abused its discretion. First, the time crunch that Fisher was under was of its own making, and Fisher's choice to take the sworn statement/deposition without consulting with the

court or opposing counsel shows a disregard for the power all courts must exercise over parties to proceedings before it in order to effectively dispense justice. *See Capital City Ins. Co. v. BP Staff, Inc.*, 382 S.C. 92, 103, 674 S.E.2d 524, 530 (Ct. App. 2009) ("The court has broad discretion in its supervision over the progression and disposition of a circuit court case in the interests of justice and judicial economy."). Also, it is necessary to uphold the court's authority to enforce its own orders—here, the order of protection—when a lawful means of challenging a particular order is available. If Fisher believed it was necessary to preserve Dr. Oury's testimony for the record and submit it as a proffer, it could have sought the court's permission to do so at the pre-trial hearing in accordance with the court's language in its January 7 order of protection: "The [c]ourt will address the admissibility of the testimony for trial and rescheduling of the Oury deposition, if necessary, at the pre-trial hearing scheduled for January 9, 2019." The circuit court also gave Fisher the option of a second digestion study meeting Rita's conditions, and Fisher has failed to show that this option could not have been completed before the end of trial.

Fisher argues that it acted in good faith. We disagree. After Fisher's counsel received Mr. Holder's e-mail regarding division of the tissue by an uninterested third party, they made no effort to respond or to advise opposing counsel that the tissue samples had already been divided at that point. Additionally, they made no effort to respond to Mr. Holder's letter asking if another tissue division could be commissioned. In sum, Fisher abandoned any good faith efforts to make things right once it was notified of opposing counsel's concerns, and we are concerned that reversing the sanctions order would send a message to Fisher's counsel that they are not required to be forthright with opposing counsel or the circuit court when rushing to pursue evidence advantageous to their case on the eve of trial.

Further, the sanction imposed, a written slap on the wrist, was mild, and Fisher has failed to carry its burden of showing this sanction prejudiced Fisher or was otherwise "without reasonable factual support." *See Davis*, 409 S.C. at 282, 762 S.E.2d at 543 ("An 'abuse of discretion' may be found by this [c]ourt where the appellant shows that the conclusion reached by the [circuit] court was without reasonable factual support, resulted in prejudice to the right of appellant, and, therefore, amounted to an error of law." (quoting *Dunn*, 298 S.C. at 502, 381 S.E.2d at 735)). We agree with the circuit court that both Rita and the circuit court were blindsided by Fisher's failure to engage in forthright communications with them. Therefore, we affirm the circuit court's sanctions order.

**CONCLUSION**

Accordingly, we affirm in part and remand for the circuit court's *in camera* review of the settlement documents. We also direct the circuit court to reconsider the respective amounts to be set off against the jury's compensatory damages awards for Rita's three claims.

**AFFIRMED IN PART AND REMANDED.**

**HEWITT, J. and HILL, A.J. concur.**